**Gladys M. HELDMAN, Plaintiff, and Billie Jean King, Intervenor-Plaintiff,**

**v.**

**UNITED STATES LAWN TENNIS ASSOCIATION, a non-profit membership organization, et al., Defendants.**

**No. 73 Civ. 162(MP).**

United States District Court,
S. D. New York.
Feb. 7, 1973.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for plaintiff, by Jerome Doyle, New York City, of counsel; and Wolfe, Hubbard, Leydig, Voit & Osann, Chicago, Ill., by C. Frederick Leydig and J. Robert Cassidy, Chicago, Ill., of counsel.

Burke & Burke, New York City, for intervenor-plaintiff by George Harris and Robert H. Golde, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants, by Roy L. Reardon, Charles Koob, and George W. Gowen, New York City, of counsel.

## OPINION

POLLACK, District Judge.

The plaintiff, a recent promoter of women's professional tennis and the plaintiff-intervenor, ranked the world's number one woman professional tennis player, have sued to enjoin the United States Lawn Tennis Association ("USLTA" hereafter) and its officials from alleged interference with their respective business opportunities including plaintiff's promotion of professional tournaments and plaintiff-intervenor's freedom to play professional tennis in any tournament where other professionals are playing for prize money.

The defendants are charged with barring or threatening to bar women professional tennis players who participate in events that do not accept USLTA tournament rules and obligations from competing in prize money tournaments sanctioned by USLTA—those for which the rules of USLTA are accepted. The plaintiff is engaged in promoting tournaments for players under contract to her for which she has failed or refused to obtain USLTA sanctions. The complaint charges that the alleged conduct of defendants in this regard is in violation of the antitrust laws and amounts to a boycott and restraint of trade under Section 1 of the Sherman Act. The complaint further asserts that defendants' conduct unlawfully interferes with plaintiffs' contractual and business relations and is actionable under state law.

The complaint was filed on January 9, 1973 and 10 days later plaintiff presented therewith an application returnable January 26, 1973 for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and Section 16 of the Clayton Act, 15 U.S.C. § 26, together with a request for a temporary restraining order. The Court ordered an immediate evidentiary hearing on the application and evidence was taken on five trial days, commencing on January 26, 1973, consisting of the testimony of witnesses and a substantial volume of exhibits. Decision was reserved on conclusion of the hearing.

In order to view the issues on this application in proper focus it is necessary to understand the backgrounds of the parties and the events from which this controversy arises. They are the following:

### 1. *The USLTA*

#### a. *Amateur Competition*

Defendant USLTA is a non-profit membership organization founded in 1881 and devoted to the development of tennis as a means of healthful recreation

and physical fitness and to the establishment and maintenance of rules of play and high standards of amateurism and good sportsmanship. None of the officers receive any compensation for what they do.

The Constitution of the USLTA provides that there are five categories of members: Sectional Associations and Direct Member Clubs which are the only voting members of the Association, and Member Clubs and Organizations, Individual Members and Honorary Members. There are only three Direct Member Clubs, 17 Sectional Association members and several hundred Member Clubs and Organizations. A current Standing Order provides that all players resident in the United States or Puerto Rico, desiring to play in USLTA sanctioned tournaments, are required to enroll as Individual Members of the USLTA.

In order to achieve its objectives, the USLTA promulgated rules and regulations incorporated within its By-Laws and Standing Orders, for the approval or "sanctioning" of tennis tournaments, exhibition matches or team matches proposed to be held by any of its members.

There are sound reasons for sanctioning which are not anti-competitive in purpose. It assures uniformity of rules of play so that the caliber of players may be rated or "ranked" on the basis of an identical standard; it aids to assure an orderly schedule of tournaments which accommodates the reasonable needs of the players, the promoters and sponsors for organized competition; and it fosters the aim of providing the public with tennis competition of high caliber and ethical standards. Sanctioning indicates that a particular tournament is an official USLTA approved tournament, that the rules of tennis as defined in the Official USLTA Yearbook will be followed, that proper draws will be made, and that the results of the event will be considered for USLTA and local ranking purposes.

Under the rules and regulations of the USLTA, players who compete in unsanctioned events where spectator admission is charged, players' expenses paid or prize money offered, *may* be debarred from tournaments conducted pursuant to USLTA rules and regulations. Such action may, however, be taken only in accordance with specific provisions of the USLTA by-laws which provide such players with a full hearing, including the right to be represented by counsel and the right to appeal; debarment is not mandatory.

Prior to 1968, the USLTA only sanctioned amateur tournaments. There were professional tennis tournament players prior to that time, but they did not come under the jurisdiction of the USLTA once they "had turned pro." Rather, they played under contract with individual promoters and they toured the country playing exhibitions and tournaments; they were sometimes referred to as "contract pros" or "touring pros".

### b. Professional Competition

In 1968, the USLTA along with the International Lawn Tennis Federation ("ILTF" hereafter) and its ninety-six member associations reorganized this system. Professional Players were allowed to play for prize money and to participate in designated USLTA sanctioned events; these are players who accept and perform under the rules and regulations of the USLTA and the events are designated as "open" tournaments.

Pursuant to the standing rules and regulations of the USLTA, a Professional Player is eligible to participate in sanctioned USLTA tournaments if that player has played *only* in tournaments sanctioned by the USLTA. Should that player participate in a "non-sanctioned" event, in which prize money is awarded, that player *may* be assigned the status of a contract pro, in which event he or she may participate only in those USLTA tournaments which are designated "open for *all* categories" of players, *i. e.*, those who do or do not play under USLTA rules. A contract pro may apply for reinstatement to be permitted thereafter to play under the rules and regulations of USLTA thus restor-

ing his eligibility for sanctioned tournaments.

After the change mentioned above was effected in 1968, promoters began to place top professional men under contract and to deliver them to tournaments only for a fee. The international coordinating body for amateur and professional tennis (ILTF) reacted to this development by closing all events to players under contract to such promoters. The ILTF has sanctioning power over international tournaments, including the U.S. "Open" held at Forest Hills. However, in July 1972, an agreement was reached with respect to men players, and now all ILTF as well as USLTA sanctioned tournaments are open to men contract pros.

USLTA sanctions are obtained on application therefor through a Sectional Organization and payment of a sanction fee. The sanction application goes to the USLTA Sanctions and Schedules Committee for its approval. In the case of prize money tournaments with more than $500 in prize money, the sanction fee is 6% of the prize money and travel allowance offered. The purpose of the fee is to help defray administrative costs of processing the application, the compilation of extensive records required to determine rankings, and the promotion of tennis. One-half of all sanction fees (except those for USLTA national title events) is returned to the Section in which the event is held for its purposes and uses. For the year 1971, to assist the plaintiff in her organization of a women's professional circuit, the maximum fee for women's events was $480.

Women's professional tournaments at first carried small prizes; in 1968 and 1969 there was $250,000 in prizes for men, $2,000 for women. This disparity was a particular source of disaffection for the women. In the summer of 1970, two top women players—including the intervenor herein—approached the plaintiff to ask her help in righting this disparity.

## 2. The Plaintiff-Tennis Promoter

Plaintiff Gladys M. Heldman, a resident of Houston, Texas, has for 20 years past been the owner, editor and publisher of "World Tennis Magazine" which had a circulation of about 40,000 copies in 1969 that increased to over 90,000 copies by December 1972 when she sold the magazine to Columbia Broadcasting System, continuing however as its editor and publisher. Mrs. Heldman formerly played tournament tennis, having ranked No. 1 in Texas, No. 2 in the Southwest and having played at Wimbledon and Forest Hills. She is a life member of the USLTA and has served it in official capacities. She first became a promoter or organizer of women's professional tennis tournaments in September 1970. She soon obtained her principal financial backing and sponsorship from the Philip Morris Company.

Plaintiff organized a tournament event for eight women, which was played in Houston in the fall of 1970 which had a prize purse of $7,500. The USLTA did not sanction that event, but all the players signed on with plaintiff for one week to gain the status of contract pros; in this way, the players fell outside the USLTA jurisdiction and the host club was not hosting an unsanctioned event.

During 1971 and 1972, plaintiff planned and launched an annual circuit of women's professional tournaments, which came to be known as the Virginia Slims tournament, named after a product of Philip Morris, the principal advertiser for these events. Plaintiff obtained USLTA sanctions for these events. She testified that her applications for the sanctions had met with dilatory processing, but the record is clear that every single event of 1971–2, with one exception, received a USLTA sanction without objection. In the one contrary case, for a television tournament, the USLTA withheld the sanction temporarily while the plaintiff refused, in violation of an agreement with USLTA, to turn over certain funds properly to be directed to the Grand Prix Tourna-

ment; the sanction was issued when the money was delivered.

### 3. *Plaintiff's Contract with USLTA*

In February 1972 in what plaintiff describes as an effort to achieve a working truce between herself and the USLTA, plaintiff agreed to serve as the USLTA Director of the Women's Professional Tennis Tour and Chairman of the USLTA Scheduling and Sanctioning Committee for Women's Professional Tennis. She was also appointed Chairman of the Women's Open Circuit Committee of USLTA. In these capacities, plaintiff performed the same type of promotional activities she had rendered before her USLTA contract. That is, she arranged a series of tournaments and sought sponsorship for them. The tournaments were sanctioned by the USLTA and retained the Virginia Slims name and sponsorship.

Plaintiff's contract with USLTA was for a term expiring February 1975, provided that, either party might terminate it as of February 1, 1974 by a written notice of intention to do so given prior to November 1, 1973.

However, in August of 1972, plaintiff publicly announced her resignation as Director of the Women's Pro Tour, to be effective at the end of the 1972 tour on October 15, 1972. This unilateral termination was well in advance of the contractual term; plaintiff claims— but in no way has demonstrated—that defendant USLTA had previously breached the contract. Documents in evidence strongly suggest that plaintiff's claim was not shared by her legal advisers, who informed her on the contrary that the USLTA might have a legal claim against her particularly if she had in mind competition and started to compete with USLTA by forming a rival circuit in violation of her obligations under the employment agreement. In resigning, plaintiff issued a press release from her World Tennis Magazine headquarters, quoting herself as follows:

Now that we have established 22 tournaments, we feel that the USLTA can and should have the opportunity to take over. I am certain they will do a proper job for the players, the sponsors and the tournament directors. I would stay in forever, but the job of running the Circuit is tremendously time-consuming and expensive. I cannot neglect World Tennis Magazine, which is "my baby" and which is now rapidly becoming a teenager.

At the hearing, plaintiff testified that this statement did not contain all the reasons for her resignation, that it was in some ways "a white lie". The words of the statement, however, are quite clear, and reveal an unequivocal specific intent to turn over the women's tour to the USLTA and to withdraw from the field in order to care for her magazine.

The USLTA notified plaintiff on September 19, 1972 that at its meeting of September 8, 1972, the Executive Committee had accepted the resignation— more formally relayed by plaintiff's counsel—and· was relieving her of all USLTA duties. The association thanked plaintiff for her publicly stated confidence in the USLTA and assured her that "USLTA will continue your promotion of the women's game." At that time, the officers of the USLTA were not aware that in fact the plaintiff had planned and taken steps implementing her return to promotion of women's pro tennis under a new and different banner—a personal tour circuit of her own; indeed, the incoming ·president of the USLTA testified that had the association known of plaintiff's intention and conduct they would not have released her from her employment contract with the USLTA. Clearly, players and the sponsors were "presold" by the plaintiff for her new venture for the next season before the announced termination of plaintiff's connection with USLTA affairs on October 15, 1972.

Plaintiff testified that she had a change of heart in September 1972, right near the end of the U.S. National Championships tournament at Forest Hills. The Court is by no means convinced at this time that this "return"

to independent promotion of tournaments, outside the structure of the USLTA, was not considered by plaintiff at the time of her resignation. It should be noted that although plaintiff claims her decision was largely prompted by the entreaty of the players to "stay on with us" as well as by tournament directors and sponsors who asked her to continue, none of these people seem to have suggested or urged her to create a circuit independent of USLTA. And certainly none of the players asked her to "stay on with us" in a way that would cause them the difficult choice of selecting between competing promoters and events. Plaintiff's "stay[ing] on" more accurately must be described as a "departure".

### 4. The New Circuit

In mid-September 1972, plaintiff drew up and distributed a form contract, which players were handed and urged to sign, beginning on September 11, 1972. That date is prior even to the notice of September 19 from the USLTA that plaintiff was released from the balance of her contract and of course prior to the effective date of her resignation, October 15. Plaintiff advised the players whose association she was seeking—without authority from the USLTA—that those who signed would be suspended by USLTA from all its events, a representation repeated by her in subsequent communications with the players. Plaintiff signed top ranked players, and now has 65 players for her circuit.

Pursuant to plaintiff's form contract —every player was required to sign this form, with proposed modifications automatically rejected—each woman must commit herself to 18 tournaments—the entire Virginia Slims schedule for 1973. Players are specifically refused permission to enter only some of these events: it is an "all or nothing" arrangement. Plaintiff emphatically testified that this commitment is requisite to properly promote the circuit. No exceptions are stated beyond an automatic leave to play

in one's own national tournament. If a player enters a tournament which competes with a Virginia Slims event, that player agrees to the entry of an injunction against her if sought by plaintiff. Plaintiff reserved the right to assign the contracts to any corporation or federation she might form and head.

Additionally plaintiff proceeded to line up sponsors for her circuit, using as a base those involved in the USLTA sanctioned circuit for 1972. Included in her catch was the principal sponsor, Philip Morris, which stands ready to contribute $500,000 to the tournaments. Representatives of Philip Morris testified that in September 1972, the company had to decide whether to back plaintiff or to support the USLTA tour; the decision was purportedly to follow the lead of the players. However, documents in evidence trace the close relationship between plaintiff and Philip Morris from as early as 1971. The USLTA incoming president testified that he was subsequently informed by the Chairman of Philip Morris that the sponsor was always ready to follow plaintiff. The record shows that the clerical staff of Philip Morris was made available to plaintiff to help her quickly get out her contract forms on September 11.

While plaintiff, in secrecy from USLTA, was locking up players and sponsors for 1973, the USLTA, acting on plaintiff's suggestion that it should take over the women's tour, was making arrangements to carry on its women's professional program, to which it stated it had "a very strong obligation." Staff appointments were made to succeed plaintiff, and meetings were held with players and sponsors.

When the true situation had become apparent, USLTA officials made endeavors to find a way in which plaintiff's circuit could nonetheless exist in harmony with the women's professional circuit that USLTA was putting together for 1973. Plaintiff was urged to apply for sanctions for her tournaments. She refused.

Of particular significance in the conciliatory approaches to the plaintiff is a meeting held in Boca Raton, Florida, in mid-November 1972 during the sanctioned tournament held there. Among those attending the meeting were the incoming president of the USLTA, the head of the disciplinary committee, the new USLTA women's pro director, plaintiff, her lawyer, and the players. The head of the disciplinary committee, who is a corporate lawyer, explained the USLTA rules and regulations to these players and advised them that they had a right to leave the USLTA in order to form their own league and to play for money, just as the men professionals had done several years before. He further explained that those women who chose this alternative might be classified by the USLTA as "contract professionals." He explained that such professionals can only play in the USLTA events which are open to all categories of players, such as the U.S. Nationals at Forest Hills had been designated. No threat of suspension was made to the women, implicitly or overtly; the USLTA official simply described the USLTA rules to players who were at that time competing in a USLTA event and who had been advisd by plaintiff that they faced USLTA suspension. From the several versions of this meeting given in testimony, the Court specifically concludes that the defendants did not act with any sinister purpose or effect as claimed by plaintiff but rather were seeking fairly to achieve a sensible accommodation between competing interests.

The Court additionally finds that the other meetings and discussions held with the players and with sponsors were equally free of sinister and illegal purpose and effect. Defendants simply sought to carry on the USLTA circuit abandoned by plaintiff and to induce the plaintiff to "stay on" with USLTA by applying for sanctions for her 1973 tournaments. Plaintiff's attempt to prove the opposite consists of naught but imperfect shadows of self-interested conjecture.

Plaintiff has not sought USLTA sanctions for the 1973 events. She testified to her belief that sanctions would not be timely granted but, in any event, offers no convincing proof, indeed nothing more than surmise, to support this position. Since plaintiff has chosen not to apply for sanctions, although urged to do so by the USLTA representatives, the players on her tour may be classified as contract pros by the USLTA and would be eligible to enter only those USLTA events open to all categories. The U.S. Nationals at Forest Hills, the so-called "Super Bowl" of tennis, has for the last few years been open for all categories of players. Its classification for 1973 has not yet been considered or determined. However, this Court finds no credible evidence of any "threat" that any of the Virginia Slims players will be declared ineligible for this important event, or of the imminence of any such ruling pending the final determination by this Court on the merits of the suit.

At this moment, the USLTA has scheduled a 1973 winter circuit for women to run from February 26 to April 23 and has playing for it some top ranked players who have not signed with plaintiff. Plaintiff's tour of eighteen events is also now under way. It is apparent that the prize money offered by the USLTA is not as substantial as that available in plaintiff's tournament circuit. However, for the USLTA events, a player need not sign a contract, nor commit herself to play in every tournament; she may elect which events to enter.

For 1973, therefore, there appear to be two circuits. Players can choose whether or not to sign on with plaintiff; if they do, they must play in all 18 tournaments. Or, the players may choose to play in USLTA sanctioned events, selecting those scheduled events in which they wish to participate. Because of the restrictive player's contract with plaintiff the only tournaments to be held in the United States this year in which *all* the top ranked players might have the chance to compete against one another

are Forest Hills and those USLTA tournaments which do not conflict with plaintiff's schedule.

During the time in which women's professional tennis has developed into a major sports attraction, plaintiff has played a central role, as an editor and promoter. She has the loyalty of many top players. She has key sponsors following her. Her position does not appear precarious. Mrs. Heldman has her players, has her sponsors, and has her tournaments.

### 5. *The Intervenor-plaintiff*

Billie Jean King, a sportswoman and celebrity ranked No. 1 by the USLTA for some years and now ranked as the No. 1 woman professional tennis player in the world, has been granted leave to intervene herein as a plaintiff. In allowing this permissive intervention, the Court indicated that counsel for plaintiff Heldman would be lead counsel in the present proceeding and that the intervenor would be subordinate to the original plaintiff. Ms. King is a life member of USLTA.

Intervenor King signed on with plaintiff's circuit; her contract bears the date, October 1, 1972. She thereby agreed to play in each event on that circuit, barring hardship such as injury, from which she is currently suffering. Ms. King claims to want to play in USLTA sanctioned events during her off weeks from Virginia Slims tournaments and applied during the course of this hearing for permission to play in a USLTA event in Hingham. However, that event was rescheduled to avoid a conflict of dates with The Federation Cup tournament to be played in Germany and Hingham's date now competes with a Virginia Slims tournament. Under the terms of her contract with plaintiff, intervenor can no longer play in that USLTA contest. The record clearly shows that Ms. King had the option to play in USLTA events without any risk of ineligibility for USLTA tournaments, but she elected to sign with plaintiff, fully aware that plaintiff would not seek USLTA sanctions for the Virginia Slims tournaments.

### 6. *The Applicable Law*

Consideration of whether an injunction should issue necessarily begins with the proposition that injunctive relief is an extraordinary remedy. An injunction represents a type of custom tailored law, directing a defendant and his agents either to refrain from or to perform specified conduct; this direction is backed by the authority and, if necessary, the contempt power of the Court. This remedy should not be granted without the most searching and careful exercise of the discretion of the Court. Injunctive relief in advance of the trial is available only to the plaintiff who cannot be adequately compensated by money damages and who comes before the Court free of any inequitable conduct on her part with respect to the matters in dispute. While the so-called clean hands doctrine may provide no defense to an antitrust violation when the merits are being decided, at this stage this equitable doctrine may well be applied; as of now, no violation of law by defendants has been tried, established or decided.

The function of a preliminary injunction is to preserve, as best as is possible, the status quo pending a trial on the complaint which will determine if a permanent injunction should issue. It is improper to issue a preliminary injunction where such a grant would effectively provide all the relief sought in the complaint.

The burden which plaintiffs must satisfy to be entitled to this extraordinary relief is generally said to consist of three showings.

First, the plaintiffs must show that, absent the protection of a preliminary injunction, they will suffer immediate, irreparable harm pending the final resolution of the suit. Irreparable injury, in part, is that which cannot be compensated by an award of money damages.

Second, the plaintiffs must prove that they have at least a reasonable probability of ultimate success on the merits. This does not mean that the record must convince the Court of the validity of each allegation in the complaint. Rather, the Court must find only enough evidence presented at the evidentiary hearing to conclude that plaintiffs will likely establish the essential elements of the asserted claim.

Third, the plaintiffs must show that the grant of a preliminary injunction is so important to them as to outbalance any inconvenience to be suffered by the defendants under the terms of the provisional relief. The Court must "balance the equities" and find that the balance tips decidedly in favor of plaintiffs.

These variables are dependent. If the plaintiffs, for example, can demonstrate a great probability of ultimate success on the merits, then the severity of harm which need be shown might decrease. But where the injury to defendants produced by an injunction would be great, the plaintiffs must demonstrate more persuasively the likelihood of irreparable injury and of success on the merits at trial. *See* Sanders v. Air Line Pilots Association, International, 473 F.2d 244 (2nd Cir. 1972); Stark v. New York Stock Exchange, Inc., 466 F.2d 743 (2nd Cir. 1972); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2nd Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462 (E.D.Pa.1972); Clairol Inc. v. Gillette Co., 270 F.Supp. 371 (E.D. N.Y.1967), aff'd, 389 F.2d 264 (2nd Cir. 1968).

These equitable tests apply equally to a request for a preliminary injunction made under Sec. 16 of the Clayton Act.

For reasons to be stated hereafter, the Court concludes that the evidence adduced at this hearing *fails* to substantiate the claims by plaintiff and by intervenor of irreparable injury and *fails* to tip the balance of equities decidedly in favor of said plaintiffs.

[7] Given those conclusions, the Court need not precisely evaluate the strength of the merits of plaintiff's case at this stage. Suffice it to say that there are close and complex issues raised —particularly with regard to the antitrust allegations—which should only be resolved upon a full trial of the facts. At this point, the record contains virtually no evidence of tortious conduct by defendants and contains insufficient evidence of a conspiracy to interfere with plaintiff or with intervenor, of any effort to monopolize the field of women's professional tennis, or of group boycott by defendants. The Court cannot, on this record, confidently project plaintiffs' success on the merits.

Plaintiff contends that with ineligibility and the denial of opportunities to compete in USLTA sanctioned tournaments, the star players under contract to her can lose abilities, further opportunities, and public support. She alleges that an interlocking system of sanctions is being deployed to effect these predicted suspensions. As her players decline in talent and popularity, plaintiff concludes she will be harmed as a promoter. Additionally, plaintiff avers that defendants have conspired to undermine her contracts and business arrangements and argues that, left unchecked, defendants will destroy plaintiff's promotions. The intervenor claims that, being under the alleged threat of suspension or at least the alleged uncertainty of a threat of lifelong suspension, she is unable to make timely career plans and is forcd to forego valuable opportunities. She projects losses of around $40,000 to $50,000 would be suffered if she is ineligible to play in the U.S. Nationals.

The present record, including the resolution of issues of credibility therein, does not warrant these cries of distress.

◼ While plaintiff and intervenor are proclaiming the power of defendants, it is plaintiff's circuit that appears fully organized, financed and operative. Some 65 players have signed on with plaintiff, each committed to play the

entire circuit. All parties admit that this group of 65 includes most of the top ranking women professionals. At most, the record reveals that a few foreign players, who depend on their local tennis associations for support, may be frightened by the possible effect of non-conformance with USLTA rules. But it is clear that eligibility problems would be avoided if plaintiff applied for and received what seem to be the readily available sanctions for her events. No such application has been filed.

In terms of sponsors, the principal advertiser in professional women's tournaments these last few years has been Philip Morris. The USLTA wanted to hold onto this sponsor, which had contributed to the 1972 circuit run by plaintiff under contract for the USLTA. However, Virginia Slims chose and decided to back plaintiff. Other advertisers have done the same, enabling plaintiff to run a circuit holding out some $800,000 in prize money.

Plaintiff alleges repeated instances of tortious conduct by defendants and portrays a conspiracy organized to wreck her tournaments. Such blatant interference would of course be of the character constituting irreparable injury. However, the Court has not been convinced by credible evidence that this type of interference is occurring. Plaintiff's counsel concedes that no evidence has been provided to establish tortious interference with business opportunities or contracts.

Plaintiff and intervenor claim irreparable injury would be produced if the Virginia Slims players were ineligible and therefore barred from the national tournaments, particularly Wimbledon and Forest Hills. The short answer to this is that the claimed injury at the moment is only speculative: it is by no means clear that the players under contract with plaintiff will be barred. Indeed, the evidence on record suggests the opposite—there just has not been any decision whether these events will be, as they were in the past, open to all categories. In any event, this Court need not—and should not—speculate, for a decision on the merits can be filed sufficiently in advance of those important events if plaintiffs' counsel can ready their cases for early trial.

Intervenor King claims an earnest desire to play tennis, just to play tennis, with the best players in the world, whenever and wherever she desires. Of immediate concern to her are the demands of scheduling that confront an outstanding player and an emerging celebrity. She contends that unless an injunction issues, she cannot decide how to plan for the weeks in which there is no Virginia Slims event. This type of injury is not irreparable. Ms. King saw a valuable opportunity in plaintiff's contract and opted for it; she has available to her the chance to win large sums of prize money and with that the subsequent opportunities of endorsements that accrue to athletic stars. That other tournament opportunities may be lost to her —or more likely, that her ability to plan which opportunities to elect will be available for consideration at a time which is shorter than desired—does not, on this record, support a preliminary injunction.

The primary support for the allegations of irreparable injury is in the testimony of plaintiff, her former tour director, and the intervenor, who is under contract to plaintiff and who serves as a director of plaintiff's tennis federation. This testimony is contradicted by other portions of the evidence adduced at the hearing. Having presided over the five days of hearing, and having had the benefit of the demeanor evidence along with the other evidence, this Court has not been persuaded by this testimony; the issues of credibility on the significant matters in controversy are resolved in favor of the defendants.

Ms. King and 64 other players elected to sign up with plaintiff. Virginia Slims and other advertisers decided to finance plaintiff; tennis clubs have agreed to host 18 events. And plaintiff chose not

to apply for USLTA sanctions. The Virginia Slims tournaments are presently being held. This is the thrust of the record. The talk of threats and the context in which they allegedly appeared and the allegations of tortious conduct were not credibly supported and do not entitle injunctive relief. The Court has been shown no immediate injury, nor any irreparable injury; indeed, there is little proof of any injury at all.

■ Plaintiff contends that an injunction would have no adverse effect on defendants, stating that such an order would simply insure the participation of Virginia Slims players in USLTA events. Defendants, however, claim that a preliminary injunction of the scope requested by plaintiff and intervenor would effectively check the functioning of the USLTA in the area of women's professional tennis and could thwart the functioning of the sanctioning system as to all players and clubs.

The record reveals these risks cited by defendants. The evidence does not support a decisive tipping of the equities in favor of the plaintiff or the intervenor.

For over 90 years, the USLTA has played an important role in the development of tennis, centering primarily on amateur competition. It has adopted a set of uniform rules for the game, as well as a set of sanction rules designed to foster the integrity of competition. While there is some evidence that the sanctioning rule might be read broadly, the evidence has not shown this provision to be outside the "rule of reason." *See* Deesen v. Professional Golfers' Association of America, 358 F.2d 165 (9th Cir.), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966). It would unduly damage the prestige and the operation of the USLTA to enjoin its rules before an adverse determination on the merits.

■ Among the powers entrusted to the District Judge, few must be exercised with as much caution and deliberation as the power to issue a preliminary injunction. The evidence gives substantial indication of violation of fiduciary duties of good faith and fair dealing imposed on plaintiff by her close relationship with the USLTA. This conduct invokes the "clean hands" doctrine as a supporting ground for denial to the plaintiff of a provisional injunction. The other grounds already stated fully warrant denial of such relief to both the plaintiff and the intervenor.

■ In deciding to deny a preliminary injunction, the Court has not attempted to resolve the merits of the suit: that resolution will await the presentation of further evidence at trial, after counsel have availed themselves of discovery procedures if they be so advised. The present ruling does suggest that at this point plaintiffs' ultimate success on the merits does not appear sufficiently probable so as to overcome their "shortcomings on the other burdens." Sanders v. Air Line Pilots Association, International, 473 F.2d 244 (2nd Cir. 1972). Certain legal questions appear close, and the introduction of further facts will be decisive, especially evidence of what occurs between this date and the trial. The Court will particularly note the decisions made by the USLTA with regard to Virginia Slims players in its meeting later this week and will closely review the rules and procedures employed should any players be ruled ineligible for USLTA events. Reasonable rules are vital to the orderly preservation of tournament tennis. Rules intended to or having the natural effect of defeating competition, on the other hand, cross the line of legality.

What seems apparent to this Court is the need, if not the desire, of affected parties to achieve a formula to legally, fairly and equitably accommodate the underlying interests of the players, the promoters, and the USLTA. The public's interest in tennis ought not to be mired in litigation if that can be avoided. Such an accommodation of interests is, of course, a matter for the parties themselves to consider and resolve.

The motion for a preliminary injunction is denied in all respects. However, this action is set down for a trial on the merits commencing March 26, 1973. Plaintiff's counsel has stated that he will require four to six months to be ready for trial. If counsel desires a postponement, the trial date will be reset for a date as soon thereafter during the Spring of 1973 as plaintiff and the intervenor choose to proceed.

The foregoing shall constitute the Court's findings and conclusions in accordance with Federal Rules of Civil Procedure 52(a).

So ordered.