Kenneth S. LINSEMAN

v.

WORLD HOCKEY ASSOCIATION.

Civ. No. H-77-462.

United States District Court,
D. Connecticut.

Oct. 28, 1977.

Brandon J. Hickey, Murtha, Cullina, Richter & Pinney, Hartford, Conn., Robert L. Caporale, Fine & Ambrogne, Boston, Mass., for defendant.

## RULING ON MOTION FOR A PRELIMINARY INJUNCTION

CLARIE, Chief Judge.

The plaintiff Kenneth S. Linseman is a nineteen year old amateur Canadian hockey player, who is challenging the validity of a regulation of the World Hockey Association (hereinafter "WHA"), prohibiting persons under the age of 20 from playing professional hockey for any team within their association, on the ground that the restriction constitutes an unreasonable restraint of trade in violation of § 1 of the Sherman Act. 15 U.S.C. § 1. The plaintiff, who is under contract to play professional hockey for the Birmingham Bulls (hereinafter "Bulls") in the 1977–1978 season, requests a preliminary injunction during the pendency of this action to restrain the WHA from applying said regulation in any manner which would prevent Linseman from playing pursuant to the terms of his contract.[1] The Court finds that there is good cause for awarding relief and therefore grants the preliminary injunction.

### Jurisdiction

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1337 and 15 U.S.C. § 15.

### Facts

On June 16, 1977 the Birmingham Bulls, one of eight member teams of the WHA, selected Linseman in the annual amateur draft of the WHA.[2] The then President of

Brenda A. Eckert, Shipman & Goodwin, Hartford, Conn., Arthur C. Kaminsky, Howard J. Schwartz, Taft & Kaminsky, New York City, for plaintiff.

1. Linseman also seeks treble damages in the amount of $390,000, a reasonable attorney's fee, and an award for the costs of the action. The consideration of this relief will be postponed until the trial on the merits.

2. The annual draft is a method of selecting hockey players which is designed to insure that the team with the most money or which has its home in the most desirable location will not be able to sign all of the best players. Beginning with the team which had the lowest record in the preceding season and continuing to the team which had the best record, each team in each round of the draft selects one player. Under league rules the selecting team has the exclusive right to negotiate with the players it selected. Several courts have suggested that similar draft systems may run afoul of the antitrust laws, on the ground that they eliminate competition for the services of the most talented athletes. *See Denver Rockets v. All-*

the WHA, William MacFarland, informed the Bulls on June 17 that this selection was null and void under § 17.2(a) of the WHA's Operating Regulations, the so-called "twenty year old rule" which prohibits a WHA team from drafting any player who will not have attained his twentieth birthday during the calendar year in which the draft is held.[3] Since Linseman was born on August 11, 1958 he will not reach twenty years of age until after December 31, 1977 and he was thus not eligible to be drafted under the terms of § 17.2(a). Furthermore, if the rule is upheld, he will be absolutely prohibited from playing professional hockey in the WHA during the 1977–1978 season.

Linseman is currently under contract to the Kingston Canadians of the Canadian Major Junior Hockey League, which contract provides that Linseman will not play hockey for any other amateur or professional hockey club until the expiration of his contract with Kingston, which is August 31, 1978. He is presently earning $75 per week for his services to the Kingston team. Linseman and the Birmingham Bulls entered into the present agreement on February 15, 1977, whereby the Bulls agreed to pay him a total of at least $500,000 for the next six hockey seasons, beginning with the current 1977–1978 season.

The defendant WHA has alleged that if Linseman is permitted to play, the league will suffer a loss in revenue in excess of two and one half million dollars. The defendant represents that this result will occur because the WHA has scheduled professional hockey games between member teams of the association and teams representing Russia, Czechoslovakia, Sweden and Finland to be played in the United States and Canada during the 1977–1978 season. The approval of the Canadian Amateur Hockey Association (hereinafter "CAHA") is required in order for the WHA teams to compete against these European teams in Canada. That organization has indicated that it would not approve those contests if the twenty-year old rule—which is the result of an agreement between the WHA and the CAHA—is violated.[4]

## Discussion of the Law

### 1. Standards for Preliminary Injunction.

■ The Second Circuit has adopted two alternative tests for determining when a preliminary injunction should issue. In *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973) the court ruled:

> "The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* at 250 (emphasis in original).[5]

Some courts have added a third requirement to the showing of irreparable injury and probable success, the "balancing of equities." *See e. g. Heldman v. United States*, 354 F.Supp. 1241, 1249–1250 (S.D.N.

---

Pro Management, Inc., 325 F.Supp. 1049, 1056 (C.D.Cal.1971); *Smith v. Pro-Football*, 420 F.Supp. 738, 744 (D.D.C.1976); *Robertson v. National Basketball Ass'n.*, 389 F.Supp. 867, 893 (S.D.N.Y.1975). Since the plaintiff has not challenged the WHA's draft, the Court expresses no opinion as to whether it constitutes an unreasonable restraint of trade.

**3.** Operating Regulation 17.2(a) reads:

"(a) Each Member Club shall make its selections from among the players who attain their twentieth (20th) birthdays between January 1st, next preceding the conduct of the draft, and December 31st, next following the conduct of the draft both dates included."

**4.** Those games between WHA member teams and foreign teams which will be played in the United States must be approved by the American Hockey Association of the United States (hereinafter "AHAUS"). Even though the estimate of loss revenues is based upon the total of 36 games to be played in both Canada and the United States, the WHA has not alleged that the AHAUS will deny approval if the rule is violated.

**5.** For a comprehensive discussion of the standards required for preliminary injunction in the Second Circuit, see Judge Mulligan's article entitled "Preliminary Injunction in the Second Circuit," 43 *Brooklyn L.Rev.* 831 (1977).

Y.1973). This third factor means, in essence, that preliminary relief is not warranted unless the court finds that the importance of the injunction to the plaintiff is such that it outweighs the inconvenience which will be visited upon the defendant from the issuance of the injunction. *Id.* at 1250. The addition of this third factor is consistent with the teaching of the Supreme Court in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975):

> "The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury and also that he is likely to prevail on the merits. It is recognized, however, that a district court must weigh carefully the interests on both sides." *Id.* at 931, 95 S.Ct. at 2568.

■ These three factors are interdependent, so that if a plaintiff makes a strong showing of irreparable injury and a likelihood of success on the merits, he may be granted preliminary relief, even though the defendant has alleged that the granting of the preliminary injunction will subject him to serious harm. *Heldman v. United States Lawn Tennis Association*, 354 F.Supp. 1241, 1250 (S.D.N.Y.1973).

## 2. *Irreparable Injury.*

If the preliminary relief is denied, Linseman will be unable to compete in the WHA for the 1977–1978 season. Despite the defendant's assertion to the contrary, the damage he will suffer as a consequence cannot be adequately compensated with monetary damages. The plaintiff will forfeit more than the salary he has coming to him under the contract with the Bulls, if he is denied permission to play in the WHA for the current season. The career of a professional athlete is more limited than that of persons engaged in almost any other occupation. Consequently the loss of even one year of playing time is very detrimental.

That Linseman would be able to continue playing hockey with the Kingston Canadians for the current season does not reduce the impact of this injury. That team competes in an "amateur" league,[6] whereas the Birmingham Club is in competition with professionals. The nature of Linseman's occupation is such that it requires constant practice against the very best competition possible in order to finely hone his hockey skills. The difference between the league in which the Kingston Canadians plays and that in which the Bulls compete is such that it is a difference in kind rather than one of degree. By playing in the WHA, Linseman may achieve the status of a "superstar" which would bring him financial and emotional rewards in excess of his salary from the Bulls. Such rewards are not available to members of the Kingston Canadians, for the simple reason that the league in which the team competes does not receive the same notoriety and public exposure as do teams in the WHA. Whether and to what extent Linseman would receive compensation in addition to that provided in his contract would be impossible to determine if he were presently denied the opportunity to test his skills against those of other professionals.

In a case which is very similar to the one *sub judice* a basketball player was granted a preliminary injunction to permit him to continue playing for the team of his choice despite his ineligibility under the league rules. On the issue of irreparable injury the court ruled:

> "If Haywood is unable to continue to play professional basketball for Seattle, he will suffer irreparable injury in that a substantial part of his playing career will have been dissipated, his physical condition, skills and coordination will deteriorate from lack of high-level competition, his public acceptance as a super star will diminish to the detriment of his career, his self-esteem and his pride will have been injured and a great injury will have

---

**6.** The word "amateur" has a connotation in the world of hockey which is different from the meaning normally given to that word. The amateur hockey players in Canada are in fact paid and enter into contracts to play for the amateur hockey teams.

been perpetrated on him." *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1057 (C.D.Cal.1971). A professional football player was also granted preliminary relief in a similar situation, where the court found that his inability to play would cause him irreparable injury. *Bowman v. National Football League*, 402 F.Supp. 754, 756 (D.Minn.1975). The considerations which led those courts to find that a professional football or basketball player would suffer irreparable injury, if he were not granted preliminary relief, are equally applicable to a professional hockey player.

3. *The Probability of Success on the Merits.*

■ Linseman has alleged that the WHA's twenty-year old rule is an unreasonable restraint of trade in violation of § 1 of the Sherman Act. 15 U.S.C. § 1. At the outset it must be noted that although baseball, largely for historical reasons, has been ruled exempt from the antitrust laws, *Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972), no other professional sport enjoys a similar exemption. *See Philadelphia World Hockey Club Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462 (D.C.Pa.1972) (hockey); *Radovich v. National Football League*, 352 U.S. 445, 451–452, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) (football); *Boston Professional Hockey Association v. Cheevers*, 348 F.Supp. 261 (D.C.Mass.), remanded on other grounds 472 F.2d 127 (1st Cir. 1972) (hockey); *United States v. International Boxing Club*, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955) (boxing); *Blalock v. Ladies Professional Golf Association*, 359 F.Supp. 1260 (D.C.Ga.1973) (golf).

■ To prevail in a Sherman Act § 1 treble damage suit the plaintiff must prove three elements: (1) an agreement (2) which unreasonably restrains trade and (3) an effect on interstate commerce. That the eight teams of the WHA consented to the adoption of Operation Regulation 17.2(a) is sufficient to constitute the agreement component of this formula. Since the WHA operates in eight different cities, schedules games in different states and in Canada,

and derives substantial revenue from broadcasts of league contests, it is most likely that the plaintiff will be able to establish an effect on interstate commerce at the trial on the merits. *See Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1062 (C.D.Cal.1971).

■ While the Sherman Act by its terms imposes a blanket prohibition on "every" contract, combination or conspiracy in restraint of trade, judicial construction of the Act long ago established that only "unreasonable" restraints are illegal. *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The primary difficulty with this "rule of reason" is that it often requires difficult factual inquiries and subjective policy judgments which are more appropriate for legislative, rather than judicial, determination. Recognizing this difficulty, the Supreme Court on many occasions has ruled that with respect to certain kinds of restraints the problems inherent in applying the rule of reason outweigh any possible advantages; these practices are labelled "illegal *per se*," which means that they will be held illegal without regard to any claimed justification for the restraint. *See Northern Pacific v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1957).

■ The practice of which Linseman complains in this case is known as a group boycott or a concerted refusal to deal. The WHA and its member teams have agreed not to deal with Linseman solely for the reason that he will not have attained the age of 20 before December 31, 1977. A group boycott, or a concerted refusal to deal, has been long and consistently classified as a *per se* violation of the Sherman Act. *Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457, 468, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1043 (2d Cir.), *cert. den.* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Modern Home Institute Inc. v. Hartford Acc. & Ind. Co.*, 513 F.2d 102, 109 (2d Cir. 1975).

The twenty-year old rule of which plaintiff complains in the instant case constitutes a "primary" boycott wherein the actors at one level of trade (the WHA and its member teams) refuse to deal with an actor at another level (Linseman). A threefold harm results from a primary boycott. First, the victim of the boycott (Linseman) is excluded from the market he desires to enter. Second, competition in the market in which the victim attempts to sell his services (hockey players in the WHA) suffers. Third, by pooling their economic power, the individual members of the WHA have substituted their own private government for the rule of the marketplace. *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1061 (C.D.Cal.1971).

While *Klor's, supra,* and *Fashion Originators' Guild, supra,* seemed to declare every group boycott *per se* illegal, an exception to this broad rule was created in *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), where the Court ruled that a "justification derived from the policy of another statute or otherwise" might save a concerted refusal to deal from the *per se* rule. Id. at 348–349, 83 S.Ct. at 1252. While lower courts have encountered some difficulty in discerning the precise parameters of the *Silver* exception, the cases indicate that three things must be demonstrated to qualify:

"(1) There is a legislative mandate for self-regulation 'or otherwise'. In discussing the history of the New York Stock Exchange in *Silver*, the Court suggests that self-regulation is inherently required by the market's structure. From this basis, it has been argued that where collective action is required by the industry structure, it falls within the 'or otherwise' provision of *Silver*. Note, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1486 (1966).

"(2) The collective action is intended to (a) accomplish an end consistent with the policy justifying self-regulation, (b) is reasonably related to that goal, and (c) is no more extensive than necessary.

"(3) The association provides procedural safeguards which assure that the restraint is not arbitrary and which furnishes a basis for judicial review." *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1064–1065 (C.D.Cal. 1971).

It is doubtful that the WHA would be able to demonstrate that even one of these three prerequisites exists in the instant case. First, there is no reason to believe that collective action is required by the industry structure in order to determine who should be permitted to play professional hockey. This case is distinguishable from *Deesen v. Professional Golfers' Ass'n. of America*, 358 F.2d 165 (9th Cir.), *cert. den.* 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76, *reh. den.* 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1966), where the court approved a league rule permitting only those approved by the association to participate in PGA sponsored matches. The purpose for this rule was to insure that the number of golfers who would compete in a given match would not be so great that some would be unable to complete the course in daylight hours. 358 F.2d at 172, n. 9. In order to accomplish this goal some mechanism had to be constructed whereby the number of participants would be limited. By contrast, even though it may be necessary for the WHA to adopt restrictions with respect to the number of players each team may employ, there is no need for concerted action as to which specific players will be employed. That determination, under our free market system, ought to be left up to each individual team.

 Secondly, the attention of the Court has not been directed to any valid purpose for the twenty-year old rule. The major thrust of defendant's argument has been that the WHA itself did not initiate the rule, but was coerced by the threat of a boycott against its member teams by the foreign teams with which it has scheduled contests if the WHA teams did not agree to the twenty-year old rule. Court have uniformly rejected any defense that an antitrust violation was "forced" onto the de-

fendant. The Supreme Court has held that "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161, 68 S.Ct. 915, 931, 92 L.Ed. 1260 (1948). *See also Otto Milk Company v. United Dairy Farmers Coop. Ass'n.*, 388 F.2d 789, 797 (3d Cir. 1967); *Flintkote Company v. Lysfjord*, 246 F.2d 368, 375 (9th Cir. 1957), *cert. den.* 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); *Calnetics Corp. v. Volkswagen of America Inc.*, 532 F.2d 674, 682 (9th Cir.), *cert. den.* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); *Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.*, 245 F.Supp. 889, 892 (N.D.Ill.1965). Another reason suggested for the twenty-year old rule is that the Canadian junior hockey league, from which the WHA and National Hockey League draw much of their talent, would fail if the most talented teenagers were signed by professional teams. If these Canadian junior teams failed to draw spectator support, the pool of talent relied upon by the professional leagues would dry up. The hockey leagues lack an organized farm system or an adequate number of college teams as a source from which to draw their players. Regardless of whether this chain of events may come to pass in the future, if the twenty-year old rule is abrogated, that is no justification for an organized restraint of trade. The antitrust laws do not admit of exceptions due to economic necessity.

> "Exclusion of traders from the market by means of combination or conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins." *United States v. General Motors Corp.*, 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966).

If the WHA needs a training ground for its prospective players, the principles of the free market system dictate that it bear the cost of that need by establishing its own farm system. As to the argument that the Canadian league is unable to survive without the twenty-year old rule, the Sherman Act does not permit a failing enterprise to be buoyed up with an illegal agreement to restrain trade.

Third, there is lacking in the present case any procedural safeguards of the type envisioned by *Silver*. Under such circumstances, the Court focused on the need for a notice and hearing, which would serve to both act as a check against illegitimate self-regulation and provide the anti-trust court with a record from which it can determine whether the self-regulation was justified. *Silver v. New York Stock Exchange*, 373 U.S. 341, 363, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Lower courts have refused to apply the *Silver* exception where such procedural safeguards are lacking. One of the essential factors in the *Deesen* court's decision in upholding the PGA's exclusion of the plaintiff from professional golf matches was the provision for a number of test rounds and a panel of judges to evaluate his performance. 358 F.2d at 168. By contrast, in a case challenging the validity of the National Basketball Association's restriction preventing the signing of players until the passage of four years after their high school graduation, the absence of a hearing was dispositive on the issue of whether the *Silver* exception should apply. *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1066 (C.D.Cal.1971).

██ Defendant argues that the instant case is distinguishable from *Denver Rockets* in that § 8.2 of the WHA By-Laws provides a procedure whereby a player may submit to the Executive Committee or to the full Board of Trustees of the WHA any objection to the disapproval of a player contract, and argues that plaintiff should have pursued his remedies under that section before litigating in this Court. Despite this appeal procedure, Operating Regulation 17.2(a) is unequivocal. There is no provision for any exceptions to this rule, as in the case with the American Basketball Association's "hardship" exception to its four year college rule. Therefore if Linseman had appealed to the Executive Board or the Board of Trustees, those bodies would have been powerless to alter the rule. Consequently,

Linseman comes to this Court as if he had no appeal procedure available to him at all; the law will not require an individual to perform a meaningless act.

The greatest distinction between the case at bar and *Deesen* is that the rule in the present case is completely arbitrary. While the rule in *Deesen* excluded players only after their skill had been assessed, the present rule is a blanket restriction as to age without any consideration of talent. The Court may take judicial notice of the fact that many teenagers have played in the professional ranks with distinction. Darryl Dawkins, Moses Malone, Bobby Orr and Gordon Roberts are a few names which come readily to mind.

In sum, the Court rules that the narrow exception of *Silver* is not applicable to this case and that the concerted boycott which the WHA participated in is *per se* illegal.

Defendant has raised three other defenses, none of which is likely to prevail at the trial on the merits. First, defendant claims that the fact that Linseman's contract with the Kingston Canadians provides that that club has the exclusive rights to his services for the coming hockey season precludes Linseman's suit against WHA. That fact has no relevance to this lawsuit. Employment contracts are not specifically enforced, and if it is determined that Linseman's playing for the Birmingham Bulls is a breach of his contract with the Kingston Canadians the latter team can be compensated by an award of money damages.[7] The existence of a similar exclusive service clause in an existing contract with another team did not prevent the court from awarding preliminary relief in the *Spencer Haywood* case. *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1054 (C.D.Cal.1971).

Secondly, the WHA contends that since it could have disapproved Linseman's contract on the basis of other irregularities,

this Court should not reach the issue of whether the twenty-year old rule violates the Sherman Act. Specifically defendant charges that the Birmingham Bulls signed Linseman before the date of the annual draft in violation of Operating Regulation 17.10, and that the Player Contract executed by Linseman was forwarded to the league by counsel for Linseman rather than by the team as provided in paragraph 15 of the Standard Player Contract. Furthermore defendant argues that it has not yet taken any formal position as to whether it will approve Linseman's contract, which is a prerequisite to his playing in the WHA. In spite of these arguments, the Court finds that the telegram which was sent on June 17, 1977 to the Birmingham Bulls by William MacFarland, the then President of the WHA, informing the Bulls that Linseman was not eligible to play due to Operating Regulation 17.2(a) is sufficient indication that the WHA is attempting to prevent Linseman from playing because of the twenty-year old rule. Additionally, defense counsel admitted in oral argument that the WHA's real concern with the Linseman contract was the twenty-year old rule.[8] Thus, it is the twenty-year old rule which is preventing Linseman from playing in the WHA.

The third defense proffered by defense counsel is the "act of state doctrine." The theory is that there can be no antitrust liability for acts performed pursuant to the command of a foreign government. Though this would be a valid defense if it could be proven, the Court finds that the defendant would almost certainly be unable to establish this defense at a trial on the merits. It should be noted that the defendant bears the burden of proving that the act of state doctrine is applicable. *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 691, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

---

7. There are indications that Linseman and the Kingston Canadians have already entered into negotiations to release Linseman from the contract.

8. *See* transcript of oral argument, pages 28–29.

The genesis of the act of state doctrine is the following statement of Chief Justice Fuller:

"Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897).

This doctrine was first applied in an antitrust case by Justice Holmes in *American Banana Company v. United Fruit Company,* 213 U.S. 347, 358, 29 S.Ct. 511, 53 L.Ed. 826 (1909). This doctrine is not based on the Constitution or on an international law, but rather upon the realization that the judiciary may hinder the executive in its conduct of foreign affairs if it were to pass on the validity of acts of a foreign government. *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 108–109 (C.D.Cal. 1971), *aff'd* 461 F.2d 1261 (9th Cir.), *cert. den.* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). A corollary to the act of state doctrine in the antitrust field is that "corporate conduct which is compelled by a foreign sovereign is also protected from antitrust liability, as if it were an act of the state itself." *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 606 (9th Cir. 1976).

Defendant's reliance upon the act of state doctrine is expected to be unavailing for two reasons. First, defendant has offered no proof that the twenty-year old rule was in fact ordered by the Canadian government. The affidavit of William MacFarland states merely that the rule was "endorsed" by the Minister of Health who wished to "discourage" the drafting of teenagers from the Canadian amateur leagues. The defendant also points to Judge Higginbotham's decision in *Philadelphia World Hockey Club v. Philadelphia Hockey Club,* 351 F.Supp. 462 (E.D.Pa.1972) where the judge found:

"While there is apparently no legal bar which precludes the WHA's contracting with amateur players of any age, the Canadian government in regulating its sponsored amateur leagues would *prefer* that the professional leagues draft only amateurs who are over 20 years of age." *Id.* at 472 (emphasis added).

Neither one of these statements can be construed to imply that the complained of practice was "compelled" by the Canadian government, and a showing of compulsion is what is required in order to invoke the act of state doctrine.

"The Court has already decided that state authorization, approval, encouragement or participation in restrictive private conduct confers no antitrust immunity." *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 592–593, 96 S.Ct. 3110, 3118, 49 L.Ed.2d 1141 (footnotes omitted).[9]

*See also, Goldfarb v. Virginia State Bar,* 421 U.S. 773, 790–791, 95 S.Ct. 2004, 44 L.Ed.2d 572, *reh. den.* 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 606 (9th Cir. 1976); *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291, 1296 (D.Del. 1970); *United States v. The Watchmakers of Switzerland Information Center, Inc.,* 1963 Trade Cases par. 70,600 (S.D.N.Y.1962) order modified 1965 Trade Cases par. 70,352 (S.D.N.Y.1965).

Second, even if defendant were able to prove at trial that the twenty-year old rule was the result of compulsion by the Canadian government, the act of state doctrine shields only conduct which is perpetrated within the territorial boundaries of the foreign country. The doctrine cannot be used to excuse the commission of illegal acts within the territorial boundaries of the United States. *See United States v. Sisal Sales Corp.,* 274 U.S. 268, 276, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); *Republic of Iraq v.*

---

**9.** Though this case dealt with the act of state doctrine as it applies to one of the states of the United States, *Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 80 (Van Graafeiland, J., dissenting) makes it clear that the Court's ruling in *Cantor* was also applicable to the act of state doctrine as it applies to foreign governments.

*First National City Bank*, 353 F.2d 47, 51 (2d Cir. 1965), *cert. den.* 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966); Schwartz, "The Arab Boycott and American Responses: Antitrust Law or Executive Discretion." 54 *Texas L.Rev.* 1260, 1275 (1976); Baker, "Anti-trust Remedies Against Government-Inspired Boycotts, Shortages, and Squeezes: Wandering on the Road to Mecca," 61 *Cornell L.Rev.* 911, 917 (1976). Indeed, given the fact that the rationale for the doctrine is to foreclose judicial review of acts of foreign governments which occur "on their own soil," *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 697, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), it would be startling to find that it has application to acts occurring on United States soil. In the present case, the restriction would prevent Linseman from playing hockey in the United States, and thus the act of state doctrine would not be applicable.

*4. Balancing the Equities.*

Having found that Linseman will suffer irreparable injury, if he is denied the preliminary relief he seeks, and that there is a great probability that he will prevail in a trial on the merits, the Court now turns to a discussion of the balance of equities. As noted above, in balancing the equities, the Court must weigh the importance of the preliminary relief to the plaintiff against the potential harm to the defendant should the relief be granted. The Court finds that the importance of the interim relief to Linseman outweighs any harm that may result to the WHA.

The WHA has submitted that it stands to lose in excess of $2.5 million if Linseman is permitted to play in the current season. This loss will result from the refusal of the CAHA to sanction any hockey contests scheduled between WHA teams and teams from foreign countries. It is not at all certain that the WHA will in fact suffer this loss. In the first place, this figure represents the projected ticket sales revenue from all 36 contests scheduled between WHA member teams and foreign teams to be played in both the United States and Canada. While it has been alleged that the CAHA, which must sanction the contests to be played in Canada, will withhold its approval if Linseman plays, there is nothing in the record to suggest that the AHAUS, responsible for games scheduled in the United States, will similarly deny approval. Secondly, the WHA's projection of average attendance at these games of 11,000 with an average ticket price of seven dollars, which was used to arrive at the total of potential lost revenue, may be somewhat optimistic. Third, defendant's counsel conceded that he did not know whether the CAHA's position might be altered by the fact that Linseman was playing pursuant to a court order rather than from a voluntary breach of the agreement between the WHA and the CAHA by the WHA.

More importantly, however, even if the Court were convinced that the WHA would lose $2.5 million, there is no reason to permit a violation of the antitrust laws by the defendant to prevent the issuance of a preliminary injunction to the plaintiff. The Court has already determined that there exists a great likelihood that the WHA's twenty-year old rule will be held at trial to be a classic case of a *per se* illegal concerted boycott, which is not redeemed by either the act of state doctrine or the economic compulsion argument. Thus the WHA is in a position where it has entered into an agreement which violates the antitrust laws of the United States and is now arguing that the Court, in balancing the equities, should use that violation as a reason for denying plaintiff's request for a preliminary injunction. Such a result would be the very antithesis of the concept of balancing the equities. Any financial harm which results to the WHA as the result of the issuance of this preliminary injunction is "self-imposed," in that it will result from the WHA's passage of a rule which violates the Sherman Act. *See Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1058 (C.D.Cal.1971).

In reaching this conclusion that the balance of equities favors the plaintiff, the Court notes that the most important factor is the strength of plaintiff's argument that

he will prevail on the merits. Since the most important evidence in this case is documentary and because the application of the *per se* rule eliminates the need for the detailed factual inquiry of the rule of reason, the probability of plaintiff's prevailing on the merits can be readily determined at this preliminary stage. The probability of the plaintiff's ultimate success on the merits is a virtual certainty.[10]

In sum, the present case is indistinguishable from the *Spencer Haywood* case. In that case Haywood, in apparent breach of an exclusive service contract with the Denver Rockets of the American Basketball Association, signed with the National Basketball Association's Seattle Supersonics. Haywood's contract with the Seattle Club was in violation of § 2.05 of the NBA's by-laws which provided that no player may be signed until after the passage of four years from his high school graduation. The district court had granted Haywood a preliminary injunction to permit him to play with the Seattle Club. This decision was reversed by the court of appeals. Then Justice Douglas reversed the court of appeals, ruling that the granting of the preliminary injunction was proper. *Haywood v. National Basketball Ass'n*, 401 U.S. 1204, 1206, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971).

The court in the *Haywood* case rejected two justifications which are similar to ones which have been urged before this Court, namely that the four year college rule encouraged basketball players to secure a college education and that it is necessary to the NBA as a substitute for a farm system. *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1066 (C.D.Cal.1971).

Defendant would distinguish the *Haywood* case on the ground that Haywood was already playing for the Seattle team at the time the injunction issued and that therefore the injunction merely preserved the status quo during the pendency of the litigation. By contrast, the WHA argues,

Linseman is not currently playing for the Bulls and the granting of the injunction would upset, rather than preserve, the status quo. To distinguish that case on this basis would be to encourage a policy of "play now, litigate later." The difference between Linseman and Haywood is that the former has come to this Court for a determination of his rights rather than forging ahead on his own. Such conduct should be encouraged, not discouraged.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court, pursuant to Rule 52(a), Fed.R.Civ.P.

### Security For Costs

Rule 65(c) of the Federal Rules of Civil Procedure provides that the applicant for a preliminary injunction shall post security in such amount as the Court deems proper for the payment of costs and damages which may be incurred in the event that the other party has been improperly enjoined. Therefore the Court after thorough consideration of the possible injury to the WHA should it ultimately be determined on appeal that this preliminary injunction should not have been issued, requires that the plaintiff post a bond, with full surety, in the amount of Fifty Thousand Dollars ($50,-000).

---

10. The Court notes that Linseman is not a minor. In the State of Connecticut the age of majority is 18. *See* Con.Gen.Stat. § 1–1d. Likewise in each of the provinces of Canada the age of majority is either 18 or 19. *See* 1977

Martindale-Hubbell Law Directory, Vol. VI, at pp. 2966, 2993, 3026, 3050, 3068, 3089, 3131, 3161, 3183 and 3209. Therefore, the Court need not consider whether the result might be altered if the plaintiff were a minor.