GUNTER HARZ SPORTS, INC., formerly Werner Fischer Sports, Inc. of America, Plaintiff,

v.

UNITED STATES TENNIS ASSOCIATION, INCORPORATED, Defendant.

Civ. No. 79–0–655.

United States District Court,
D. Nebraska.

March 4, 1981.

Michael L. Schleich, Omaha, Neb., for plaintiff.

Steve Gerdes, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

Plaintiff brings this action under the antitrust laws of the United States, seeking permanent injunctive relief and treble damages pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for defendant's alleged violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has jurisdiction of the action and the parties under 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15, 22 and 26. The suit was tried to the Court without a jury. This memorandum shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

The present controversy grew out of the decision of the United States Tennis Association (USTA) to honor a temporary ban imposed by the International Tennis Federation (ITF) on the use of "double-strung" tennis rackets, and the USTA's subsequent adoption of a new rule of tennis defining a tennis racket, which was promulgated by the ITF and replaced the temporary ban. The plaintiff alleges that the USTA's actions constitute a conspiracy with various others, not made defendants to this action, to restrain competition in the sale of tennis rackets and tennis racket stringing systems in the United States and abroad, in violation of Section 1 of the Sherman Act.

The facts are these. The plaintiff, Gunter Harz Sports, Inc. (Harz Sports), originally incorporated under the name Werner Fischer Sports, Inc. of America (Fischer-America), is a corporation organized under the laws of the State of Nebraska, with its principal place of business in Omaha, Nebraska. Harz Sports is engaged in commerce in the business of manufacturing and distributing tennis rackets and tennis racket strings and stringing systems in the United States, as well as internationally. The president and incorporator of Harz Sports is Gunter Harz.

The defendant USTA is a Type A not-for-profit corporation, organized under the laws of the State of New York, with its headquarters located in New York, New York. The USTA is a voluntary membership organization made up of Sectional Associations, Member Clubs, Individual Members and Honorary Members from all over the United States. The avowed purposes of the USTA include: the promotion of the development of tennis as a means of recreation and physical fitness; the establishment and maintenance of rules of play and high standards of amateurism and good sportsmanship; and encouraging, sanctioning, and conducting local, national, and international tennis tournaments and competitions under the best conditions possible so as to effectively promote the game of tennis with the general public.

The USTA is the recognized sanctioning organization governing tournament tennis, both amateur and professional, in the United States. Sanctioning indicates that a particular tournament is an official USTA approved tournament and insures that the international Rules of Tennis, promulgated by the ITF, and the Tournament Regulations of the USTA will be followed. The results of sanctioned events are the input for a multi-level ranking system administered by the USTA which ranks every person who participates in sanctioned events in the United States, whether amateur or professional.

The USTA is a member of the ITF, an international body made up of 104 national tennis associations from all over the world. The ITF is a democratic body and is managed by representatives of the member national associations who assemble in an Annual General Meeting and are referred to as "The Council." Every two years, the Council appoints a Committee of Management (COM), consisting of eleven persons, which has administrative powers to carry on the work of the ITF between Annual General Meetings, and to administer the finances of the Federation.

The primary purpose of the ITF is to foster and promote the integrity of tennis

competition internationally. One of the ITF's objects in pursuing that purpose is to uphold the uniform, international Rules of Tennis promulgated by the ITF and to make such alterations and additions to such Rules as may appear necessary or desirable. Changes in the Rules of Tennis can be effected only by resolution, carried by two-thirds majority of the votes cast by the delegates from member nations when the Council meets at an Annual General Meeting. Such resolution must be received by the General Secretary of the ITF at its headquarters in London not later than three months before the date fixed for the Annual General Meeting, and must be included in the written agenda for that meeting sent to all the member nations.

As a condition of membership in the ITF, all member national associations agree that the ITF Rules of Tennis will be obeyed in all tournaments sanctioned by the national associations. Accordingly, official USTA Tournament Regulation No. 1 provides in relevant part:

> The Tournament Regulations herein contained and the international Rules of Lawn Tennis shall be observed throughout all tournaments held by clubs, associations or organizations belonging directly or indirectly to the USTA.

During the early 1970's, a novel method of stringing a tennis racket, dubbed "double-stringing," was developed in West Germany by a Bavarian horticulturist, Werner Fischer. The main and cross strings of a conventional tennis racket are interlaced or interwoven, and are all on the same plane. In contrast, Fischer's double-strung racket has two layers of main strings, one layer on each side of the cross strings, and the main strings are independent, and not interlaced or interwoven with the cross strings. Short lengths of protective nylon tubing are placed on the main strings at each intersection with the five double cross strings, and each layer of main strings is tied together with five tie cords, one knotted directly below each of the five rows of protective tubing. Epoxy (adhesive coating) is used to keep the short nylon tubes and the tie cords in place.

The double-strung racket was first brought to the attention of the ITF by a May 2, 1977, telex from the Swiss Tennis Association asking whether the ITF accepted a new tennis racket with double strings which was being marketed. Other inquiries and comments from member associations, players and the press followed. At its meeting at Wimbledon in June, 1977, the ITF COM examined and discussed a sample of the double-strung racket, provided by Dr. Grimm, the General Secretary of the European Tennis Association. Deciding the matter deserved attention, the COM took the matter a week later to the Annual General Meeting of the Council of the ITF in Hamburg, where the President of the ITF reported that a new type of tennis racket was on the market which was strung to give far more spin to the ball and told the delegates of member associations that the COM was interested in receiving reports from associations and players on the racket.

Between the July, 1977, Annual General Meeting in Hamburg, and October, 1977, the ITF office in London received a number of reports of player reaction to the double-strung racket, including written reports from the Swiss, German and Austrian federations where the racket had become widely used.

On October 1–3, 1977, the COM met in Barcelona, Spain, to consider, among other items on its agenda, the double-strung racket. At the Barcelona meeting, the COM witnessed a demonstration game using both the double-strung rackets and conventional rackets, and considered written reports regarding double-strung rackets from the German, Austrian and Swiss tennis federations, and oral reports concerning the racket from representatives from France and Spain. The COM also considered press reports concerning the threatened boycott of the 1977 French Championships by players to protest the use of the double-strung rackets, and "strange" results at the Coupe Poree Grand Prix tournament on September 19–26, 1977, in Paris, the Gold Racquet Grand Prix tournament in Aix-en-Provence,

France, on September 26–October 2, 1977, and the U. S. Open in Forest Hills, New York, in September, 1977, where several top-ranked world class professionals were upset by lower ranked players using double-strung rackets.

After consideration of the evidence before them, and acting under their emergency power under ITF Rule 57 to settle all urgent questions subject to confirmation at the next Annual General Meeting, the COM issued a temporary ban on the use of rackets with double strings or protuberances. The COM approved a statement for distribution to national associations and the press, stating that from October 3, 1977, only single-strung rackets would be accepted at official tournaments and competitions, including club and regional events sanctioned by national associations. The stated purpose of the temporary "freeze" was to enable the ITF to collate research on the effects of the racket on match play. The release noted that the "Committee of Management does not want to stand in the way of technological progress, but it must be sure that new developments benefit the game." The COM appointed a Technical Sub-Committee to investigate and forward suggestions to the COM on the standardization of rackets. This press release was also published verbatim in the ITF "President's Newsletter" dated October 6, 1977. The President's Newsletter is the main vehicle for presentation of the news and views of the ITF and is distributed worldwide to member nations, people involved in the promotion and organization of tennis, members of the trade and journalists. The October

6, 1977, newsletter stated that the COM would again meet in Paris in January of 1978 and would receive any comments or suggestions that member nations would send to the ITF office in London for discussion at that meeting.

On October 18, 1977, the USTA distributed USTA Press Release No. 120–77, announcing that the USTA would honor the ITF's temporary prohibition on the use of tennis rackets with double strings or protuberances, in order to permit an in-depth study by the ITF, technical groups, and the USTA. The USTA's stated reasons for honoring the ban were that "the USTA, as a member of the ITF, believes uniformity of rules is especially important in tennis because of the worldwide tournament schedule" and that "in addition * * * it has been suggested that the use of double stringing may result in a 'double hit.'" The press release stated that the ban would be in effect until further notice and would apply to international team matches such as the Davis Cup and all ITF sanctioned tournaments, as well as to all USTA sanctioned events, whether amateur or professional.

At the COM meeting held in Monte Carlo on April 13–16, 1978, the COM heard reports from the Technical Sub-Committee on its studies to date on double-strung rackets and considered all comments and information that had been collected by the ITF office in London. The COM adopted a formulation of a proposed rule for tennis rackets,[1] and a procedure whereby tennis rackets could be submitted to the ITF for a ruling on whether or not they complied with the proposed rule.[2] Included in this

---

1. The original draft of the proposed rule read as follows:

   A racket shall consist of a frame, which may be of any material, weight, size or shape, and stringing.

   The stringing must be uniform and smooth and may be of any material. The strings must be alternately interlaced or bonded where they cross. The distance between the main and/or cross strings shall not be less than one quarter of an inch nor more than one half of an inch.

   If there are attachments they must be used only to prevent wear and tear and must not alter the flight of the ball. They must be

uniform with a maximum protrusion of .04 of an inch.

2. The procedures for specific approval or disapproval read as follows:

   Procedures for specific approval or disapproval

   Any player, national association, equipment manufacturer or other interested party may formally complain to the I.T.F. that a racket in use does not conform, or may formally request confirmation that a racket does conform, to the approved Rule.

   The purpose of this procedure is to give an opportunity to apply for a ruling to any inter-

procedure was the right to appeal an adverse ruling.

In a statement dated May 12, 1978, the ITF gave notice that it was proposing to introduce a rule on the definition of a tennis racket, which would become effective from July 13, 1978, in a final form if approved at the Annual General Meeting in Stockholm on that day. The notice contained the text of the proposed rule and approval procedures and solicited comments on the proposed definition from players, administrators and manufacturers of tennis equipment. It was announced that such comments would be taken into account by the COM when it made its final recommendation to the annual meeting. All national associations were asked to circulate this request as widely as possible.

The notice also included the following statement of purpose:

> The purpose of this rule is to standardize conditions under which the players, national federations, equipment manufacturers, and other interested parties may foster and encourage improved performance in technology in racket design and manufacture, without resulting in alteration in the character of the game. We encourage progress but want it to be in the best interests of the game as a whole. We want all designers and manufacturers of rackets to have the same rule to work within, and welcome their comment, and test results in the formulation and implementation of these rules.

Designers and manufacturers were encouraged to seek advance ruling or approval on any questionable racket designs or prototypes.

This statement was distributed worldwide to numerous manufacturers of sporting goods, including Werner Fischer in West Germany, as well as to the rest of the tennis world. Also, on May 12, 1978, the agenda for the July 13, 1978, Annual General Meeting of the ITF, to be held in Stockholm, was mailed to the member nations. As required by ITF rules, the new rule for tennis rackets was included on the agenda. The agenda item on the racket rule contained a committee report which noted that further study of this rule and any testing

> ested party who is uncertain about the eligibility of a racket. Such applications will be considered in accordance with the following guidelines:
>
> That such racket shall not materially alter the flight of, or add significant spin to, the ball beyond that alteration or spin effected by the natural motion of a player's body using a racket meeting the specifications of the Rule, or
>
> Otherwise seriously affect or significantly change the character of the game.
>
> The procedures applicable to all such applications are as follows:
>
> I.
> The burden will be upon the party or parties other than the I.T.F. advocating (sic) approval or disapproval to demonstrate that the racket does or does not meet these guidelines.
>
> II.
> Application for a racket to be expressly approved or disapproved shall be made to the General Secretary of the International Federation and shall be accompanied by a prototype and test data sufficient to allow the I.T.F. to determine whether the racket meets or fails to meet the guidelines.
>
> III.
> Following receipt of a complete application the I.T.F. will make preliminary findings and inform the applicant of same, following which the applicant shall have the opportunity to submit argument and further test results upon notifying the I.T.F. of its intention to do so within not less than 20 days and produce such argument and results in writing within 45 days following such notice. Failing which notice or production such preliminary findings shall become final upon public notice thereof in the I.T.F. Newsletter. In the event of such notice and production by the applicant, the I.T.F. shall, if it deems such action in the public interest, publish its preliminary findings in the Newsletter and solicit public comment, which comment shall be taken notice of along with applicants argument and additional test results.
>
> IV.
> All reasonable expenses incurred in connection with the tests, including the staging of playing tests if requested, will be borne by the applicant.
>
> V.
> The I.T.F. encourages designers and manufacturers to seek advance ruling or approval on any questionable racket designs or prototypes.
>
> VI.
> The I.T.F. will in all cases issue the final decision under these procedures as soon as practicable.

procedures which might be required were being made and that a supplementary report would be put before the Annual Meeting.

After the May 12, 1978, statement and agenda were released, the Technical Sub-Committee recommended that a revised draft of the proposed rule be put before the Annual General Meeting on July 13, based on further study done by the sub-committee and suggestions and comments made by a number of manufacturers and stringers. A statement dated June 29, 1978, was prepared by the ITF office in London, containing the revised draft[3] of the proposed rule. The statement was immediately distributed to a number of people, including Werner Fischer and other equipment manufacturers, who had contributed to discussion of the proposed rule or who had particularly asked to be kept informed. The ITF office asked to receive comments on the revised draft prior to July 10, 1978, when the ITF staff would leave for the Stockholm meeting.

At its meeting in Wimbledon on July 6 and 7, 1978, the COM approved the revised draft and voted to submit it to the Council of national associations at the Stockholm Annual General Meeting, with the COM's recommendation that the rule be approved.

At the Annual Meeting in Stockholm on July 13 and 14, 1978, the revised draft of the rule was presented to the Council and approved by the requisite two-thirds majority of the votes cast. All of the votes of the USTA were cast in favor of the proposed rule. On approval at the Annual Meeting, the revised draft of the proposed rule became Rule 4 of the Rules of Tennis. Therefore, as a condition of membership, all national associations belonging to the ITF, including the USTA, agreed from that date on that the new Rule 4 would be obeyed in all tournaments sanctioned by the national associations.

The ITF announced the approval of Rule 4's definition of a tennis racket in the President's Newsletter dated July 31, 1978. The text of Rule 4 and the procedures for ITF approval or disapproval of a racket were printed in separate documents distributed with the newsletter. The newsletter stated that the question of the definition of a racket was not yet closed and that

> The I.T.F. already has close liaison with many manufacturers. We should like to continue to hear from them as well as from national associations and players throughout the world on the subject of the new rule. As we have said often before on this subject: we do not want to stand in the way of progress, but only to make sure that new developments in racket technology are beneficial and do not alter the character of the game of tennis.

At the time the new rule was passed, ITF Rule 57 made clear that once a rule was enacted, it was still subject to alteration by a vote of two-thirds majority of the votes cast on the matter at an Annual General Meeting of the Council as long as notice of a resolution embodying such alteration was received by the General Secretary at the Office of the ITF in London not later than three months before the date fixed for the next Annual Meeting, and was included on the agenda for such meeting.

**3.** The following is the text of the revised rule:
The Racket
The racket shall consist of a frame and a stringing.
The Frame
The frame may be of any material, weight, size or shape.
The Stringing
The strings must be alternately interlaced or bonded where they cross and each string must be connected to the frame.
If there are attachments, they must be used only to prevent wear and tear and must not alter the flight of the ball.
The density in the centre must be at least equal to the average density of the stringing.
Note to the Rule
The spirit of this rule is to prevent undue spin on the ball that would result in a change in the character of the game.
The stringing must be made so that the moves between the strings will not exceed what is possible for instance with 18 mains and 18 crosses uniformly spaced and interlaced in a stringing area of 75 square inches.

The president of plaintiff corporation, Gunter Harz, became a business associate of Werner Fischer in the summer of 1977. Prior to the temporary ban of the double-strung racket in October of 1977, Harz was employed by Fischer's German company, Fischer Besaitungstechnik GMBH (Fischer GMBH), as its international sales manager, to find licensees to market the double-strung racket. It was agreed that Harz would receive thirty per cent of the license fees resulting from his efforts. No licensee had been found prior to the enactment of the temporary ban. Shortly after the ban went into effect, the agreement between Harz and Fischer was altered to give Harz exclusive world-wide rights to market the racket himself with Fischer to receive a percentage from sales of the racket, as well as from sales of any modifications of Fischer's original design conceived by Harz. In a written agreement dated January 14, 1978, it was agreed that Harz was given the right to use Fischer's name in forming a corporation in Omaha, Nebraska, to manufacture and distribute double-strung rackets and stringing systems. Pursuant to this agreement, Harz in January, 1978, formed the plaintiff corporation under the name Werner Fischer Sports, Inc. of America. Harz then assigned his exclusive rights in the double-strung systems to that corporation.

During the period Harz was employed by Fischer GMBH he began working on improving the Fischer double-strung racket to decrease the topspin imparted to the ball and to give the ball more speed, in response to comments from tennis players at the club level in Southern Germany where the Fischer racket had the widest exposure. By the time Harz left Fischer GMBH to come to the United States, he had developed a modification of Fischer's double stringing. In place of nylon tubing and knotted tie cords used in Fischer's stringing system, Harz's modification uses four rows of pre-molded plastic pieces per layer of main strings to both encase the main strings in tubes and bind the main strings of a layer together. Harz's variation also uses six single cross strings between the layers of the main strings, in contrast to the five double cross strings of Fischer's racket, and uses a different gauge of string for the mains and crosses. Fischer-America began to market both rackets and stringing kits using Harz's modification of Fischer's double stringing under the name "Play Spaghetti" prior to the July, 1978, approval of Rule 4.

After the temporary ban of double-strung rackets, Harz and Fischer began private lobbying to build up support in the tennis community for the double-strung racket. However, the first contact between Fischer GMBH and the ITF was actually initiated by the General Secretary of the ITF, David Gray. Gray wrote Fischer on December 28, 1977, after seeing an article in the December 16, 1977, International Tennis Weekly, describing the reaction of Fischer and Harz to the temporary ban. The article stated that in the opinion of Fischer and Harz, the racket was not given a fair trial by the ITF and the circumstances under which the ITF banned the racket were totally fraudulent. Gray's letter mentioned the article and expressed surprise that Fischer had not contacted the ITF office in London concerning the investigations and tests being conducted by the ITF into racket specifications and noted that a number of other companies had submitted ideas and suggestions. Gray asked Fischer to submit some of his rackets to the ITF, as the ITF was about to begin formal tests on experimental rackets, concluding that since a number of unconventional double-strung rackets were on the market, it would be unfair if the ITF did not look closely at the rackets being produced by Fischer GMBH.

Gray's letter marked the beginning of a stream of correspondence between the ITF and Fischer GMBH. Included in that correspondence was a January 6, 1978, letter to Gray on Fischer GMBH stationery, in which Harz voiced Fischer GMBH's objections to the ban and its opinion that a fair trial period of twenty-four months should be given for testing, since for technical reasons the product couldn't be placed on the market in less than twenty-four months. Harz asked that their position be considered at the COM meeting in Paris on January 14,

and 15, 1978. Harz also met personally with Gray at the Masters' Tournament in New York in January, 1978, where Gray again asked that Fischer GMBH submit sample rackets to the ITF. That request was again repeated in letters from Gray to Harz on January 10 and January 25, 1978. Four of Fischer's double-strung rackets were received from Fischer GMBH by the ITF office in London on February 10, 1978.

On March 28, 1978, Gray received a request from Harz on Fischer-America stationery that he be allowed to speak to the COM at its April meeting in Monte Carlo. The ITF office staff informed Harz's wife by telephone that COM meetings were closed to outsiders and that Harz would not be allowed to appear. Harz made several personal visits to the ITF office in London concerning the double-strung racket prior to the adoption of permanent Rule 4, and on two occasions met personally with Derek Hardwick, the then-chairman of the Technical Sub-Committee. Fischer met with Hardwick and Gil De Kermadec, another member of the Technical Sub-Committee, concerning the proposed rule during June of 1978, in Paris.

While various Fischer rackets were submitted to the ITF, Harz never submitted samples of his "Play Spaghetti" rackets or stringing kits to the ITF for testing or formal approval or disapproval, nor did he submit his own test results on the rackets or stringing kits. Werner Fischer submitted written comments on the proposed rule, as well as suggesting a revised draft of the rule by telex to the ITF office in London. No written comments or suggestions on the proposed rule were submitted by Harz or Fischer-America.

Neither Fischer nor Harz made any official contact with the USTA office in New York about the temporary ban of the double-strung racket nor the proposed rule on racket specifications prior to the July, 1978, approval of Rule 4. However, Harz and Fischer met personally with Stan Malless in November of 1977 to discuss their views of the racket and put on a playing demonstration for him. Malless at the time was the immediate past president of the USTA and, therefore, a member of its management committee, as well as a member of the ITF COM. Subsequent to the November, 1977, visit, Harz talked to Malless about the double-strung racket on several occasions, as well as corresponding with him by letter. Neither Fischer nor Harz submitted written comments nor any sample rackets to the USTA office in New York.

No written request to appear before the USTA concerning the double-strung racket was made by either Fischer or Harz until Harz, through his attorney, requested in an August 8, 1979, letter to the General Counsel of the USTA that Harz be given a hearing at the Annual Meeting of the USTA to be held later that month in Flushing Meadows, and that, in addition, he be permitted to provide a demonstration on the use of the "Play Spaghetti" racket. In a letter of August 20, 1979, the USTA, through its General Counsel, responded that Harz might wish to apply to the ITF for further testing and demonstration, commenting that because of the international character of the game, it is important that the USTA and the other national bodies follow a uniform set of rules. The letter stated that the rules Harz complained of are reasonable and well within the discretion of the governing sports body. The letter also stated that while the Executive Committee of the USTA was to meet in New York City, the Annual Meeting was not scheduled until February, 1980. On December 28, 1979, plaintiff filed the present suit.

### APPLICABLE LAW

Plaintiff characterizes the actions of the defendant USTA, and those of the ITF and its member nations who were not made parties to this suit, as a group boycott of double-strung tennis rackets, having the express purpose as well as the effect of restraining competition in the manufacture and distribution of tennis rackets and tennis racket stringing systems in violation of Section 1 of the Sherman Act. Section 1 of the Sherman Act provides, in relevant part, that

Every contract, combination * * * or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal * * *. 15 U.S.C. § 1.

Relying on the Eighth Circuit's recent decision in *Missouri v. National Organization of Women*, 620 F.2d 1301 (8th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980), the defendant contends that the actions of the USTA are exempt from the jurisdiction of the Sherman Act under the circumstances of this case because the USTA bears no competitive or other business relationship to Harz Sports or to any other manufacturer of tennis equipment and, therefore, has no commercial or profit motivation for restraining trade by banning plaintiff's racket. Defendant would draw from the *NOW* opinion the requirement that plaintiff be a competitor of the defendant before the Sherman Act can be applied to a group boycott situation.

*NOW* involved the applicability of Section 1 of the Sherman Act to the National Organization of Women's convention boycott against all states that had not ratified the proposed Equal Rights Amendment. It is true that the court, in examining the Supreme Court's decisions under the Sherman Act, found an indication that "* * * the activities that were meant to be covered are competitive activities by competitors with some self-enhancement motivation." *NOW, supra*, 620 F.2d at 1309. However, the Court finds defendant's reliance on that case misplaced. Despite the broad dicta in the *NOW* decision, the specific issue involved in the case was "the applicability of the Sherman Act to a politically motivated but economically tooled boycott participated in and organized by noncompetitors of those who suffered as a result of the boycott." *Id.* at 1302. The case posed serious questions concerning the First Amendment right to petition the government and the court's holding that Section 1 of the Sherman Act did not apply to the boycott was based on the well-established exemption to the antitrust laws for group solicitation of

governmental action contained in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

Controlling for the purposes of this case is a footnote in the *NOW* opinion in which the court acknowledged that the State of Missouri had cited a number of cases for the proposition that the Sherman Act applies to noncommercial and non-economic boycotts, but explicitly rejected any suggestion that the court was addressing that issue:

> We do not decide that issue. The Sherman Act may apply in some situations to non-commercial and non-economic boycotts. However, we do not rest our decision in this case upon the basis that the boycott was noncommercial and non-economic. Our decision is based upon the right to use political activities to petition the government, as was the underlying factor in *Noerr*. None of the cases cited above involved the political right to petition the government, thus it is not necessary in this case to distinguish them. 620 F.2d at 1315 n. 16.

Accordingly, the Court declines to grant the activities of the USTA a blanket exemption from the Sherman Act based on *NOW*. The present controversy in no way involves the right to use political activities to petition the government. Therefore, *NOW* is not dispositive. While the Sherman Act is primarily aimed at conduct which has commercial objectives, ample authority exists for finding the activities of the USTA subject to Section 1. Non-profit voluntary associations which sanction and regulate professional sporting tournaments, races and other contests have been held subject to the antitrust laws in the exercise of their rule-making authority. *See, e. g., Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646 (5th Cir. 1977); *Blalock v. Ladies Professional Golf Ass'n*, 359 F.Supp. 1260 (N.D.Ga.1973); *Heldman v. United States Lawn Tennis Association*, 354 F.Supp. 1241 (S.D.N.Y.1973); *STP Corp. v. United States Auto Club, Inc.*, 286 F.Supp. 146 (S.D.Ind.1968); *Deesen v. Professional*

*Golfers' Ass'n of America*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966), *rehearing denied*, 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967).

Similarly, non-profit amateur athletic associations formed for the primary purpose of promoting amateur athletics have been found subject to the prohibitions of Section 1 of the Sherman Act. *Hennessey v. National Collegiate Athletic Ass'n*, 564 F.2d 1136 (5th Cir. 1977); *Tondas v. Amateur Hockey Ass'n*, 438 F.Supp. 310 (W.D.N.Y. 1977). *See also, Amateur Softball Ass'n of America v. United States*, 467 F.2d 312 (10th Cir. 1972). Courts have proceeded on the theory that while each such sanctioning organization has the primary noncommercial purpose of promoting organized sports in an orderly fashion, "its subsequent actions in carrying out its laudable objectives could trigger the applicability of the Sherman Act if such conduct restrained interstate trade or commerce in an unreasonable manner." *Tondas, supra*, 438 F.Supp. at 313.

The Court does specifically find that the USTA as a non-profit sanctioning organization for professional and amateur tennis does not compete at any level with plaintiff as a manufacturer or distributor of tennis rackets or stringing systems. While the Court finds that fact insufficient to remove the case from the jurisdiction of Section 1 of the Sherman Act, it does dictate against plaintiff's invocation of the Section 1 doctrine of *per se* unreasonableness as applied to group boycotts in *Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941) and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

The term "group boycott" can be used as a "very broad label for divergent types of concerted activity," but to outlaw certain types of conduct by merely attaching the "group boycott" and *"per se"* labels "obviously invites the chance that certain types of reasonable concerted activity will be proscribed." *Worthen Bank & Trust Co. v.*

*National Bank-Americard Inc.*, 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). The type of group boycott that has traditionally elicited invocation of the *per se* rule of illegality "is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level," *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir. 1978), and, therefore, has been an agreement "between business competitors in the traditional sense," *Mackey v. National Football League*, 543 F.2d 606, 619 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

The Supreme Court has recently cautioned that while it has held that certain agreements or practices are so "plainly anticompetitive," *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), and so often "lack * * * any redeeming virtue," *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases, "easy labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broadcast System, Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979).

The actions of the USTA in this case clearly cannot be characterized as the traditional type of group boycott to which the *per se* doctrine has been applied. The Court accepts plaintiff's contention that the USTA entered into a Sherman Act "agreement" when it joined other member nations of the ITF in the adoption of Rule 4 of the Rules of Tennis, and when it agreed to follow the temporary ban of double-strung rackets. However, the Court rejects any suggestion of "agreement," as that term is used in the Sherman Act, between the USTA or the ITF and any distributors or manufacturers of tennis equipment to prevent the plaintiff from competing in the sale or distribution of rackets or stringing

systems. Totally lacking in this case is an agreement between "business competitors in the traditional sense." Nor can the actions of the USTA in adopting a rule defining tennis rackets be labeled as lacking in "any redeeming virtue." .

■ Where the purpose of a "group boycott" has been to protect fair competition in sports and games, courts have eschewed a *per se* analysis in favor of an inquiry into the reasonableness of the restraint under the circumstances. *Hennessey v. National Collegiate Athletic Ass'n, supra,* 564 F.2d at 1152. The Court agrees that the rule of reasonableness should govern the analysis of the present controversy. As noted in *Hatley v. American Quarter Horse Ass'n, supra,* 552 F.2d at 652:

> In an industry which necessarily requires some interdependence and cooperation, the *per se* rule should not be applied indiscriminately. In some sporting enterprises a few rules are essential to survival.

Since the need for collective action is inherent in organized sports, in analyzing the rules and regulations of sanctioning organizations under the rule of reason, courts have relied on the Supreme Court's analysis in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In *Silver,* the defendant Stock Exchange ordered the termination of direct wire connections to certain non-member security dealers. Because the Securities Exchange Act of 1934 established a statutorily imposed duty of self-regulation on the exchange, which involved the obligation to formulate rules governing the conduct of exchange members, the Court found the defendant's "group boycott" should be judged under the rule of reason so that the policy in favor of self-regulation could be accommodated. However, the Court found the defendant's actions to be unreasonable under Section 1 of the Sherman Act because the Exchange could offer no justification stemming from its statutorily imposed duty of self-regulation for its collective action in denying the non-members the private wire connections without notice and an opportunity for a hearing.

■ Courts have extended the reasoning of *Silver* beyond situations involving statutorily created duties of self-regulation to areas where a need for self-regulation is inherent in an industry. *See,* Comment, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1486, 1499 (1966). Professional and amateur sports have been included in this extension. Under the reasoning of *Silver* the inquiry under the rule of reason focuses on (1) whether the collective action is intended to accomplish an end consistent with the policy justifying self-regulation; (2) whether the action is reasonably related to that goal; (3) whether such action is no more extensive than necessary; and (4) whether the association provides procedural safeguards which assure that the restraint is not arbitrary and which furnish a basis for judicial review. *See, e. g., Linseman v. World Hockey Ass'n,* 439 F.Supp. 1315, 1321 (D.Conn.1977); *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1065 (C.D.Cal.1971), *preliminary inj. reinstated, Haywood v. National Basketball Assn.,* 401 U.S. 1204 (Douglas, Circuit Justice, 1971).

■ Defendants contend that the actions of the USTA are exempt from this type of analysis under the circumstances of this case because the ITF actually initiated and promulgated the temporary ban and Rule 4, while the USTA was forced to adopt the rule as a condition of its membership. The Court finds that contention without merit. In rejecting a similar defense, the court in *Linseman, supra,* 439 F.Supp. at 1321–22, noted that "courts have uniformly rejected any defense that an antitrust violation was 'forced' onto the defendant," and that the "Supreme Court has held that 'acquiescense in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one,'" *citing United States v. Paramount Pictures,* 334 U.S. 131, 161, 68 S.Ct. 915, 931, 92 L.Ed. 1260 (1948).

The Constitution of the USTA provides that it is "an independent tennis organiza-

tion and as such cannot take any action at the request of any international tennis body which is inconsistent with the provisions of its Certificate of Incorporation or any By-Laws or Standing Orders issued hereunder." As an independent tennis organization the USTA's membership in the ITF is voluntary, and it cannot take any action at the request of the ITF, or as a condition of its membership in the ITF, which is a violation of the antitrust laws of the United States and escape liability.

■ Nor can the USTA insulate itself from liability by claiming the indispensability of the ITF as a party to this suit. *Tondas v. Amateur Hockey Ass'n, supra,* 438 F.Supp. at 315. While it is true that the plaintiff challenges the reasonableness of the actions of the ITF as well as those of the USTA, the USTA made a voluntary decision to delegate its rule-making authority to the ITF and to adopt the ITF's temporary ban of double-strung rackets and Rule 4. Thus, it is the USTA's decision that requires the Court to inquire into the actions of the ITF, as well as those of the USTA. The Court concludes that while the USTA's relationship to the ITF cannot absolve the USTA from all liability under Section 1 of the Sherman Act, it is an important factor to be taken into consideration by the Court under a rule of reason analysis.

■ Turning to an analysis of the actions of the USTA under the rule of reason, the Court specifically finds that the collective action of the USTA, ITF, and other member national associations of the ITF was intended to accomplish the legitimate goals of preserving the essential character and integrity of the game of tennis as it had always been played, and preserving competition by attempting to conduct the game in an orderly fashion. The record is totally devoid of any evidence from which an intent to injure the plaintiff or any other manufacturer or distributor of tennis equipment can be inferred. As noted previously, the Court finds no agreement between the USTA or ITF and any manufacturer or distributor of tennis equipment to exclude plaintiff from competing in the market for rackets or stringing systems.

The evidence shows that the ITF solicited, received, and acted upon comments and suggestions from equipment manufacturers, including Fischer and Harz. The original draft of the proposed rule was revised partly in response to comments of manufacturers suggesting that many conventional rackets on the market would be banned by the original draft of the proposed rule, although such rackets did nothing to alter the character of the game. However, the Court finds nothing impermissible in such communication or response. Both the USTA and the ITF had the right to solicit such information and act upon it in attempting to make reasonable informed decisions concerning racket specifications and in attempting to draft the rule so that it would be the least restrictive of technological improvements and developments, but still address the legitimate concern that such development not adversely alter the character of the game of tennis as it had been played historically or artificially enhance the skill and ability of players, thereby harming the integrity of competitive tennis.

■ Secondly, the Court concludes that the actions of the USTA and the ITF were reasonably related to the goals discussed above. In reaching that conclusion, the Court is not to substitute its own judgment for that of the ITF or the USTA. It is irrelevant whether the Court might or might not independently reach the same decision based on the same evidence. In this regard, the Court agrees with the characterization of the latitude to be given a sanctioning organization contained in *STP Corp. v. United States Auto Club, supra,* 286 F.Supp. at 151:

> * * * (N)o court has the right to step in and dictate to a sophisticated group of officials, duly elected, in a sanctioning organization which sanctions sports * *. Such rule making functions must be delegated to the powers of the governing body of that group and a court should interfere only if it finds that the powers were exercised in an unlawful, arbitrary

or malicious fashion and in such a manner as to affect the property rights of one who complains * * *.

* * * A membership organization such as USAC as a voluntary organization or one of a social nature of sports organization must be left to legislate its own rules and its own guidelines for participation of its members for the purposes for which it was created so long as that legislation is not done in an unreasonable manner and without malice or intention to harm a single member or segment of membership. Such membership organizations have the right to adopt such rules to protect their very existence.

Plaintiff contends that the actions of the ITF in enacting the temporary ban on double-strung rackets were arbitrary because the basis for the ban was a false and misleading assessment by the German Federation of a study made by the Braunschweig Technical University on the effect of double-strung rackets, and a playing demonstration using poor copies of the Fischer double-strung racket, not strung according to Fischer's specifications on stringing tension.

The Court finds that despite the actual conclusion of the Braunschweig study that double stringing did not revolutionize the character of the game and should not be banned, the study's findings did lend support to the concerns which prompted the temporary ban. The study found that strokes at high speed, as well as stroke types which primarily utilized cross strings, could be played under certain conditions only; that double stringing resulted in strokes with a very strong spin being played almost exclusively since those strokes were most effective; and that on red gravel and coarse fiber courts, when high topspin strokes were played in the baseline area, balls could bounce over the back fence and such balls could only be returned when hit right after they bounced.

The Germans represented that the study established:

a) that the range of strokes is limited or curtailed, that is to say certain strokes can only be partially played, thus the game itself is restricted.

b) that there is a handicap in that very fast balls can only be returned under certain conditions.

Based on the study's findings summarized above, the Court is unconvinced that these conclusions are not supported by the study.

Additionally, the Court finds that several manufacturers were marketing double-strung rackets at the time of the temporary ban and that some players were using homemade versions of the double-strung racket which they strung themselves. In view of this finding, the Court concludes that it was immaterial that Fischer's rackets were not used at the Barcelona demonstration since the temporary ban was aimed at the use of all double-strung rackets and not just Fischer's products.

Contrary to plaintiff's assertions, the Court finds that the ITF's temporary ban bore a rational relationship to its goal of attempting to conduct organized tennis competitions in an orderly fashion. The COM at Barcelona acted not only on the basis of the demonstration, and the German Federation's assessment of the Braunschweig study, but also on the basis of actual and threatened players' strikes against use of the double-strung racket, publicity concerning upsets of high-ranking players by virtual unknowns using double-strung rackets, and adverse reports of several national federations based on their experience with the racket in match play and in training situations. This evidence provided an objective basis from which the COM could have concluded that a temporary freeze on the use of the rackets was necessary pending further investigation and subsequent action by the ITF Council.

The Court also rejects the contention that the USTA acted unreasonably or arbitrarily in honoring the ITF's temporary ban. Stanley Malless, a member of the USTA management committee, was a member of the ITF COM and was present at the Barcelona meeting where the COM imposed the temporary ban. In deciding to honor the temporary ban, the USTA management

committee had before it an October 11, 1977, letter from Malless enclosing some of the information that was considered by the COM in enacting the ban. Enclosed was a translation of the report of the German Tennis Federation concerning their experience with the racket and their assessment of the Braunschweig study; a copy of a report of the Swiss Tennis Federation describing the players' strikes at Swiss tournaments demanding exclusion of players with double-strung rackets; a copy of a September 28, 1977, New York Times article concerning the reasons that the ITF would consider a proposal to enact a temporary freeze on the rackets at its Barcelona meeting; and copies of rules governing dimensions of rackets from the Squash Rackets Association Annual Handbook and from the English Table Tennis Association Rules. This information provided an objective basis from which the USTA could conclude that the ITF COM had acted reasonably in enacting the ban.

Because of the international character of the game of tennis and its worldwide tournament schedules, the USTA considered uniformity of rules in tennis tournaments an important factor in preserving the integrity of tennis competition. Based on this view, it was reasonable for the USTA to honor the ITF's temporary ban after deciding it was not enacted arbitrarily.

The Court also rejects plaintiff's argument that the USTA at no time had any evidence before them upon which they could base a conclusion that the proposed rule on racket specifications had a rational ground or justification. The USTA conducted no independent tests concerning double-strung rackets based on the management committee's decision that it was proper for the ITF, as the recognized rule-making authority, to conduct the tests and formulate a rule. This decision was also based on their feelings that the majority of the manufacturers of double-strung systems were then in Europe and that the ITF was closer to the technical side of tennis than the USTA.

The USTA asked Carleton Anderson, chairman of the USTA Tennis Ball Testing and Tennis Equipment Committee, to continue studying the question of racket specifications and to prepare a set of standards for submission to the ITF. Anderson became a member of the ITF Technical Sub-Committee and was, therefore, in a position to report to the USTA on the work of that committee concerning double-strung rackets and racket specifications in general. Malless, as a member of both the USTA management committee and the ITF COM, reported periodically to the USTA on the technical studies received by the ITF concerning the racket. The information contained in ITF's President's Newsletters concerning double-strung rackets and the proposed rule was also available to the USTA management committee. It was on the basis of the above information that the USTA decided to cast its votes in favor of Rule 4 at the ITF Annual Meeting in July, 1978, and subsequently adopted Rule 4 on its approval by the ITF Council.

The Court concludes that the information garnered by the ITF Technical Sub-Committee and relayed to the ITF COM and USTA management committee provided an objective basis from which the ITF and the USTA could reasonably conclude that Rule 4 was necessary to the preservation of the character of the game of tennis. Plaintiff spent a great deal of time at trial attempting to establish that no written definition of the "character of the game" exists and concludes from that fact that the ITF and the USTA relied on an arbitrary standard in respectively promulgating and adopting Rule 4. The Court finds it immaterial that no written definition of the "character of the game" exists, since the evidence in the case clearly establishes that it is widely understood merely as referring to the way the game has been traditionally played over scores of years. The ITF and the USTA talked about changes in the character of the game only in relation to the excessive amount of topspin, i. e., ball rotation, imparted to the ball by a double-strung racket.

The evidence that a double-strung racket, as compared to a conventional racket, imparts more ball rotation to a ball hit with a topspin stroke, *i. e.*, an upswing stroke, is uncontroverted. Harz conceded at trial that a double-strung racket was actually designed to impart more topspin to the ball. The independent main strings of both sides of the racket face slide from side to side on impact, causing the ball to be held on the racket face longer. This in turn causes the ball to come off the racket with a greater number of ball revolutions per minute, *i. e.*, exaggerated topspin.

The Technical Sub-Committee and COM of the ITF viewed film studies made by Sportalma, an independent Italian testing laboratory, which showed the effect of double-strung rackets on ball rotation. A subsequent study by Sportalma concluded that double-strung rackets imparted an average of seventeen per cent more ball rotation to the ball on an upswing stroke than a conventional racket. In addition, a study prepared for the USTA in anticipation of this litigation by the Coto Sports Research Center, using computerized bio-mechanical analysis, concluded that a "Play Spaghetti" racket demonstrates a twenty per cent to sixty per cent greater ability to maintain and impart spin on the ball than does the standard racket, depending on where the ball impacts with the pre-molded plastic pieces.

The Court finds that a rule on racket specifications designed to prohibit rackets which impart exaggerated topspin to the ball on impact is rationally related to the goal of preserving the character of the game of tennis. In this regard, the Court especially credits the testimony of Cliff Drysdale and Vic Braden, who are both highly qualified to testify as experts on the subject.[4]

Both Drysdale and Braden testified that the ability to impart topspin to a ball is one of the most important skills in the game of tennis. As Braden put it, being able to hit topspin is the "name of the game." Drysdale testified that it was his opinion that a player who has never been able to hit topspin with a conventional racket, could with a double-strung racket be able to hit great topspin lobs by making a very small adjustment in the way he hit the ball. Drysdale also testified that an average player using a double-strung racket would be able to serve much more effectively than with a conventional racket, making it more difficult for an opponent to return a serve and correspondingly more difficult to get the ball into play.

Similarly, Braden testified that because a player using a double-strung racket could increase spin on a serve, there would not be many service returns, which would change the character of the game tremendously. As a result, the game would lend itself to people who develop a very efficient serve with a double-strung racket. Clearly, the ITF and the USTA could rationally consider a racket's artificial enhancement of fundamental skills of the game a threat to the integrity and character of tennis as it has been historically played.

Drysdale and Braden testified that widespread use of the double-strung rackets could change the character of the game in a number of other ways as well. Since other shots with double-strung rackets are substantially less effective than topspin shots, Drysdale testified that the end result would be a situation where everyone would be

---

4. Drysdale is a professional tennis player who was ranked in the top ten players in the world for seven years. He was the first President of Association of Tennis Professionals (ATP) and is the ATP's representative on the Men's International Professional Tennis Council, which runs the Grand Prix of Tennis. Drysdale is, therefore, qualified as an expert both as a player and administrator of the game.

Braden has taught tennis for thirty-five years and has been involved in the administration of professional tennis for fifteen years. He is the founder and director of the Vic Braden Tennis College, founder of Coto Sports Research Center, and President of the International Foundation for Tennis Research. Braden has been involved in bio-mechanical studies utilizing such players as Arthur Asche, Jimmy Connors, Ilie Nastase and Chris Evert to analyze the forces necessary to be a good tennis player. He directed the study done by Coto Research on the "Play Spaghetti" racket.

playing almost exclusively topspin shots. This tendency to adopt a similar style would reduce the variety of the game as it has been traditionally played, resulting in decreased spectator interest. Additionally, the result of the topspin that a double-strung racket can impart to the ball is a ball that bounces considerably higher, causing an opponent to move back to or past the baseline to get into a position where he can contact the ball. This also prevents an opponent from aggressively "attacking" by coming to the net. In Drysdale's opinion, players being forced to back away from the net would result in administrators of the game either having to expand the dimensions of the court or changing the composition of the ball in some way to accommodate the differences caused by the racket.

Braden also testified to his assumption that as people using double-strung rackets became proficient in hitting topspin lobs, court dimensions and structures would have to be changed. Braden's research indicated that on a typical 120-foot court with a twelve foot fence, a topspin lob hit hard enough with a spaghetti racket could force an opponent to climb to a nine-foot height against the back fence.

While plaintiff presented witnesses who testified that use of double-strung rackets would not change the character of the game, as previously noted, the Court infers from the expert testimony of Drysdale and Braden that the ITF and USTA could have reasonably concluded that rackets or stringing that impart excessive topspin to the ball alter the character of the game. This is all that is necessary since the Court is not to substitute its independent judgment for the ITF or the USTA in weighing the relative opinions of expert witnesses.

The Court also concludes that the actions of the USTA in honoring the temporary ban and adopting Rule 4 were not more extensive than necessary to serve the legitimate goals of the USTA and ITF. Based on the players' strikes and walkouts occasioned by use of the double-strung racket, the Court concludes that the temporary freeze on the use of double-strung rackets in sanctioned play was no more extensive than necessary to further the legitimate goal of conducting the game in an orderly fashion, especially in view of the provision that member nations could apply for permission to experiment with the racket at club level. The Court finds it reasonable for the ITF and USTA to have concluded that the alternative of taking no action and letting the racket have a twenty-four month trial period would not have furthered that goal.

Rule 4 itself was narrowly drawn to proscribe only rackets and stringing systems that imparted exaggerated topspin to the ball, since the ITF concluded that it was that feature which changed the character of the game. The breadth of the rule was additionally narrowed by provision of appeal procedures whereby a racket that failed to conform to the face of the rule could be approved under the standard that it did not impart exaggerated topspin to the ball or change the character of the game.

Carleton Anderson, chairman of the USTA Ball Testing and Tennis Equipment Committee, recommended to the USTA the alternative that all rackets manufactured that didn't meet the rule on racket specifications be classified as "open rackets" and that USTA tournaments be specified in advance as either "standard racket" or "open racket" tournaments. The USTA rejected such a suggestion since it would result in serious complications in the administration of rankings. The Court finds that the USTA could have reasonably concluded that such an alternative would have resulted in an administrative nightmare, as well as frustrating the policy behind enforcing uniform rules of the game.

Finally, the Court rejects the contention that a lack of procedural safeguards afforded the plaintiff must necessarily result in a finding of unreasonableness under Section 1 of the Sherman Act. While it may be that neither the actions of the ITF nor the USTA would serve as a model of procedural due process, the Court finds the procedural safeguards provided adequate to

meet the requirements of *Silver* and its progeny and thus avoid liability under Section 1 of the Sherman Act.

■ The ITF's notice and comment procedure concerning the proposed rule was sufficient to inform those potentially affected by the rule of the ITF's concern about rackets which imparted excessive topspin to the ball, as well as to allow interested parties to be heard regarding the proposed rule. In view of the USTA's relationship to the ITF and its decision to delegate its rule-making authority to that body, the USTA assumed vicarious responsibility for any failure of the ITF to provide procedural safeguards, but, on the other hand, escapes liability under Section 1 when the ITF's procedures are found sufficient under the Sherman Act.

■ The plaintiff's central complaint throughout this proceeding has been that the ITF and USTA have not allowed Harz to appear personally before those bodies to present favorable evidence concerning double-strung rackets and to confront unfavorable evidence or attempt to discredit it. However, the Court finds nothing in *Silver*, its progeny, or the antitrust laws which dictate that a personal hearing is the norm of procedural due process that must be rigidly adhered to in every situation involving rule-making by a self-regulating body subject to the Sherman Act.

As noted in *Hatley v. American Quarter Horse Association, supra,* 552 F.2d at 653, in *Silver,* the defendant Stock Exchange provided for hearings to members for alleged rule violations, but Silver was a non-member. The Court noted that the extension of hearings to non-members would not burden the defendant. *Silver, supra,* 373 U.S. at 363 n. 15, 83 S.Ct. at 1260 n. 15. The Court finds the instant case distinguishable. In contrast to *Silver,* no provision for hearings on proposed rules existed under the ITF's rules or standing orders. Prior to consideration of the proposed rule on racket specifications, the ITF had never even utilized the safeguards of notice and comment in the exercise of its rule-making authority. The Court finds that the ITF did follow its own

rules in enacting Rule 4. Additionally, unlike the situation in *Silver,* requiring the ITF in this case to provide for hearings to any party potentially affected adversely by its rule-making authority could quite conceivably subject the ITF to a quagmire of administrative red tape which would effectively preclude it from acting at all to promote the game of tennis.

■ Nor can the Court dictate that a personal hearing was required for Harz on the basis that the ITF was adjudicating the relative merits of the plaintiff's product only. The Court rejects the argument that the actions of the ITF or USTA were aimed solely at plaintiff, Harz, or Fischer. As previously discussed, other double-strung rackets were on the market at the time of the temporary freeze. In addition, the proposed rule and Rule 4 in its final form proscribed not only double-strung rackets, but also stringing in which only some of the strings were interlaced; rackets with attachments that could alter the flight of the ball; rackets with a center density not equal to the average density of the stringing; and rackets that allowed more moves between the strings than possible with a conventional racket having eighteen main and eighteen cross strings uniformly spaced and interlaced. The Court finds the promulgation of Rule 4 was a legislative determination of which equipment features changed the nature of the game by the governing body charged with preserving that character. Additionally, the records of the ITF indicate that the Technical Sub-Committee formally disapproved rackets which were not double-strung, but in their opinion still failed to conform to Rule 4. No evidence of discriminatory enforcement was presented to the Court.

■ *Silver* also focused on the use of *ex parte* information and the absence of input by the applicant, as well as the Exchange's repeated refusals to disclose the reasons for its actions. *Hatley, supra,* 552 F.2d at 653. In contrast, here the ITF made a widely publicized appeal for comments and suggestions from all interested parties, including

equipment manufacturers. The ITF, through its General Secretary, David Gray, particularly sought input from Fischer GMBH while Harz was employed by that company, upon learning of the complaints of Harz and Fischer concerning unfairness of the temporary ban. While plaintiff argues that Harz was not given an opportunity to provide input to the decision makers, the record indicates that all manufacturers of tennis equipment were given equal opportunity to do just that in writing by submitting test results or comments on the proposed rule. The Court finds that other interested parties besides Harz were also refused an opportunity to appear personally before the ITF COM at the Monte Carlo meeting. There is no evidence that the ITF discriminated against Harz in any way, as was the case in *Silver.*

Moreover, the reasons for the ITF's actions were widely disclosed through the world press, tennis publications, and the mailing of notices to interested parties, including Fischer GMBH, in contrast to the situation in *Silver.* Even prior to the temporary ban, the ITF disclosed at an Annual General Meeting that its concern about the double-strung racket was that it imparted excessive topspin to the ball. Similarly, in the press release announcing the temporary freeze, the ITF enumerated all the arguments that had been made against the double-strung rackets to that point which the ITF thought deserved attention.[5] The record concerning the correspondence and discussions between Fischer, Harz, and representatives of the ITF and USTA clearly indicates that Harz and Fischer understood that the major objection to the racket was the excessive topspin imparted to the ball and the implications that had for the game.

Most importantly, the Court concludes that it was immaterial that Harz was denied a personal hearing in view of the Court's finding that the double-strung rack-et itself was given adequate attention and a fair trial by the ITF. The Court cannot agree that the failure to provide hearings deprived the Court of any record from which judicial review of the fairness of the actions of the USTA and ITF can be accomplished. The Court has been provided with an adequate record from which it concludes that the procedural safeguards provided by the ITF were sufficient to allow both favorable and unfavorable evidence to be considered by that organization and to insure that double-strung rackets were given a fair trial.

The Court finds some merit in defendant's argument that plaintiff has failed to exhaust the internal administrative remedies made available by the ITF as a further procedural safeguard. Plaintiff contends that there is no need to exhaust the racket approval and appeal process provided pursuant to Rule 4, since that remedy is frivolous in plaintiff's view that Rule 4 was specifically enacted to ban double-strung rackets. While it is apparent that plaintiff's "Play Spaghetti" racket doesn't conform to the face of Rule 4, since the strings are not alternately interlaced or bonded, it is not apparent that the appeal procedure enacted under the rule is frivolous with regard to plaintiff's racket. Such an appeal is to be considered in accordance with the guideline

> That such racket shall not materially alter the flight of, or add significant spin to, the ball beyond that alteration or spin effected by the natural motion of a player's body using a racket meeting the specifications of the Rule, or
>
> Otherwise seriously affect or significantly change the character of the game.

The appeal procedures allow an applicant to submit further argument and test results to the Technical Sub-Committee after that committee's determination that the racket does not comply with Rule 4. Derek Hard-

---

5. Those arguments include the following: that every shot made by a player using double strings is a "double hit;" that certain strokes could only be partially played; that the racket kept junior players from gaining a complete mastery of the game; that the racket caused high looping returns with an exaggerated curve and sharp kick off the ground which encouraged spoiling tactics; that use of the racket could spoil the tournament game as a spectacle; and that the rackets caused more damage to the ball than conventional rackets.

wick, a member of that committee, testified at trial that a manufacturer of a racket which is determined not to comply with Rule 4 is given the opportunity to appear personally before the technical committee to submit test results and put on playing tests to prove to the committee that the racket does not add excessive spin or alter the flight of the ball. The minutes of the November 3, 1978, meeting of the Technical Sub-Committee introduced into evidence buttress the conclusion that an applicant appealing an adverse determination under Rule 4 will be allowed to appear personally before the committee. This evidence was uncontroverted at trial.

Plaintiff has contended throughout this proceeding that the "Play Spaghetti" racket decreases the amount of topspin imparted to the ball, as compared to the Fischer double-strung racket, and that Harz should be given the opportunity to prove that through a personal hearing and playing tests. It appears to the Court that the ITF appeals procedure would provide that opportunity and, therefore, cannot be characterized as frivolous. To this point plaintiff has never submitted samples of the "Play Spaghetti" rackets or stringing kits to either the ITF or the USTA. The plaintiff has not applied for formal approval or disapproval of the "Play Spaghetti" system under Rule 4. Nor has plaintiff submitted written results concerning the "Play Spaghetti" tournaments organized by plaintiff in order to study the effects of the racket on match play.[6] Therefore, neither the ITF or the USTA has been presented with a basis for concluding that the "Play Spaghetti" modification on double-stringing poses no threat to the character of the game. In announcing the approval of Rule 4 at the July, 1978, Annual Meeting of the ITF, that body took the position that approval of the new rule did not mean the question of the racket specifications was closed. The ITF solicited the continuing comments of manufacturers of equipment, national associations, and players concerning racket specifications. The ITF rules make it clear that Rule 4 is subject to alteration at future Annual General Meetings of the ITF.

In sum, the Court ultimately finds under the rule of reason analysis, that the concerted action engaged in by the defendant, USTA, was intended to further the legitimate goals of preserving the essential integrity of the game of competitive tennis and conducting that game in an orderly fashion; that the temporary freeze of double-strung rackets and the subsequent adoption of Rule 4 were rationally related to those goals and no more extensive than necessary; and that adequate procedural safeguards were provided. Any effect the USTA's actions had on plaintiff's ability to compete in the market for tennis rackets and tennis racket stringing systems was incidental to the USTA's primary purpose in promoting tennis competition.

The Court, therefore, concludes that the defendant's actions do not constitute a violation of Section 1 of the Sherman Act. A separate order dismissing the action on the merits shall be entered in accordance with this memorandum opinion.

---

6. Plaintiff contends that no comments, suggestions, samples or test results of the spaghetti racket were submitted because Harz was induced to believe he would be given a personal hearing by representatives of the ITF and the USTA. The only evidence in the record to support this allegation is Harz's unsubstantiated testimony at trial that, besides the one written request submitted to the ITF for a hearing and the one written request submitted to the USTA for a hearing, Harz made numerous other oral requests to representatives of the USTA and ITF, and was led to believe he would receive the opportunity to appear. The Court finds there is insubstantial evidence in the record from which to conclude that Harz was misled into thinking he would receive a personal hearing.